Reese SCHONFELD, individually and derivatively as a shareholder of International News Network, Inc., Plaintiff,

v.

Russ HILLIARD, Les Hilliard and International News Network, Inc., Defendants.

No. 95 CIV. 3052 MBM.

United States District Court, S.D. New York.

Feb. 1, 1999.

Louise M. Aponte, Bruce E. Fader, Proskauer Rose Goetz & Mendelsohn, New York City, for Plaintiff.

William G. Dittrick, Jill Robb Ackerman, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, NE, for Russ Hilliard and International News Network, Inc.

James P. Murphy, Murphy, Kirkpatrick & Fain, Billings, MN, for Les Hilliard.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Reese Schonfeld, on behalf of himself and derivatively as a one-third shareholder of International News Network, Inc. ("INN"), sues Russ Hilliard and his brother, Les Hilliard, for various damages arising from the breach of an oral contract. Under the alleged contract, the Hilliards were obligated to finance a contemporaneously executed interim supply agreement between INN and the British Broadcasting Corporation World Service Television Limited ("BBC"). Plaintiff asserts, among other things, claims for breach of contract, breach of fiduciary duty and fraud.

The Hilliards now move for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all ten claims against them. In addition, the Hilliards submit two motions *in limine* to strike the proposed testimony of plaintiff's damages experts. Plaintiff cross-moves to strike all or part of the testimony of the four Hilliard experts. For the reasons stated below, the defendants' motions for summary judgment are granted in part and denied in part.

### I.

Many of the facts relating to the formation of the alleged oral contract are in dispute. The following relevant facts are presented in the light most favorable to plaintiff.

Russ Hilliard and Les Hilliard are brothers who separately own and operate small cable television companies in the mid-West. In 1988, they founded INN, a Delaware corporation, for the purpose of distributing an international news and information channel in the United States. (Russ Hilliard Decl. ¶ 2) Later that year, the Hilliards retained the financial services company Daniels & Associates ("Daniels") to prepare a business plan and solicit investors for the project. (Dickinson Dep. at 29)[1]

In 1990, the Hilliards hired plaintiff, a founder and former President and CEO of Cable News Network ("CNN"), as a consultant for INN. (Russ Hilliard Decl. ¶ 4) Later, in 1993, the Hilliards again approached plaintiff, who at that time was President of the Television Food Network, to discuss the possibility of bringing the BBC World News Channel, in a 24–hour format, to the United States. (*Id.* ¶ 5)

The Hilliards' negotiations with plaintiff culminated in a shareholder agreement, dated February 24, 1994, in which each signatory became a one-third shareholder in INN. (Russ Hilliard Decl. Ex. 1) Under that agreement, each shareholder was obligated to contribute $10,000 as equity in INN. (*Id.* ¶ 8(b)) In addition, Russ Hilliard and Les Hilliard each loaned INN $300,000 and agreed "to cause additional loans to be made to [INN] (in an amount not to exceed $350,000 in the aggregate) as may be necessary." (*Id.*) That agreement provided for a two-member Board of Directors. (*Id.* ¶ 3) Although no directors were officially designated, the record shows that Russ Hilliard and plaintiff effectively acted as directors. At this time, plaintiff also took on the roles of President and CEO of the new corporation. (Russ Hilliard Decl. ¶ 7)

With the reorganization of INN complete, the participants focused on acquiring BBC programming for a 24–hour news and information channel (the "Channel"). From the inception of the project, the parties understood that INN would be merely an investor in any entity ultimately established for the purpose of operating the Channel. INN's shareholders would be allowed to increase their equity in the proposed Channel by making additional cash investments in the operating entity rather than in INN, but no definitive decisions were made as to the percentage of profits INN, or any other equity investor, would receive.[2] (Russ Hilliard Decl. Ex. 1)

In late 1993 and early 1994, INN, through its attorney Richard Blumenthal, and plaintiff, the acting President, negotiated an agreement with the BBC, executed on March 14, 1994 (the "March Supply Agreement"). Subject to limitations, the BBC granted INN a 20–year permit to distribute BBC programming on the proposed Channel, commencing not earlier than June 1995 and not later than January 1996. (Russ Hilliard Decl. Ex. 2) The March Supply Agreement gave INN the exclusive right to distribute and license the Channel "as a whole." (*Id.* ¶¶ 7.1.2–3) Arguably, INN had exclusive rights only to the provision of programming in 24–hour blocks, permitting the BBC to license blocks of less than 24 hours to other U.S. channels. (*Id.* ¶¶ 7–8) Upon the written consent of the BBC, INN was allowed to assign the benefits of the March Supply Agreement to the proposed operating entity. (*Id.* ¶ 21.1) This consent was not to be withheld unreasonably. (*Id.*) With respect to any other assignments, however, the March Supply Agreement was personal to INN and, apparently, the BBC could grant or withhold consent for assignment

---

1. All the depositions are attached as exhibits, and listed by the name of the deponent, in Volumes III and IV of the Bruce E. Fader Declaration.

2. The Stockholders' Agreement ¶ 8(d) provides in relevant part: "Each of the Stockholders may retain for his own account any equity (received with respect to actual cash investments made by him) in the entity operating the Channel . . . ."

as it saw fit.[3] (*Id.*) In addition, the BBC reserved the right to terminate all its obligations under the March Supply Agreement if INN failed to commence distribution of the Channel by March 1995. (*Id.* ¶ 18.1)

INN made several attempts to locate investors and secure carriage agreements from cable operators in an unsuccessful effort to meet the capital requirements prescribed by the March Supply Agreement. (Russ Hilliard Decl. ¶ 11) According to Blumenthal, the Hilliards promised that, in addition to their contributions under the shareholder agreement, "they would pay the initial cost of funding INN's efforts [in] seeking to implement the original [March] supply agreement." (Blumenthal Dep. at 54) Blumenthal testified that the Hilliards made an oral promise to pay ancillary costs—such as attorneys' and consulting fees. (*Id.*)

Soon after executing the March Supply Agreement, INN was approached by Cox Cable Communications ("Cox"), one of the largest cable operators in the United States (Dickinson Dep. at 39), with an offer effectively to buy out INN's supply rights. (*Id.* at 104–05) Cox wanted to launch two BBC channels, one with news and the other with entertainment programming. (*Id.* at 91) Cox was willing to pay INN a total of $1.7 million plus 20% of tenth-year gross revenues of both the proposed channels. (*Id.* at 91–92; Fader Decl. Vol. I, Ex. 4A) The deal eventually collapsed in August 1994, however, when INN denied a re-

quest by Cox for a 90–day extension to work out with the BBC certain non-financial terms of the arrangement. (Young Dep. at 52–54, 57, 143–44)

In October 1994, the FCC announced "going forward" rules, which allowed cable operators to charge subscribers an increased monthly rate for each new channel, up to six, added as of January 1, 1995. (Pl. Mem. in Opp'n at 25) This regulatory change provided a "window of opportunity" for the Channel to obtain distribution. (Young Dep. at 70–71) Eager to be in the market when the new rules took effect, INN and the BBC arranged a series of meetings to discuss the possibility of advancing the start date for launch of the Channel. (Russ Hilliard Decl. ¶¶ 14–16)

On November 17, 1994, and in the days following, Russ Hilliard, plaintiff and Blumenthal met in New York with Mark Young and Sarah Cooper—representatives of the BBC—to negotiate a deal whereby the BBC would provide programming on an interim basis within 60 to 90 days. In an "Interim Agreement," effective December 14, 1994, the BBC agreed to provide provisional programming as early as possible, and agreed to begin development of a revised programming format, specifically designed for the American audience, for launch no later than December 31, 1995, under a revised 20–year supply agreement (the "December Supply Agreement").[4] (Russ Hilliard Decl. Ex. 3, at 1) In consideration for the interim programming feed, the Interim Agreement provided that INN

---

3. Clause 21 of the March Supply Agreement controlled all assignments and, to the extent it is relevant, provided the following:

> Save as expressly provided for herein the Agreement is personal to INN which shall not assign or sub-license any obligations hereunder in whole or in part without the prior consent of BBC WSTV. Notwithstanding the foregoing, no later than the Start–Up Date, and subject to obtaining the prior written consent of BBC WSTV (which consent in this event shall not be unreasonably withheld), INN may assign the benefit of this Agreement to an entity comprising INN and specified third party investors the com-

> position of which entity shall have been determined by agreement of BBC WSTV and INN . . . .

4. The March Supply Agreement was modified in December 1994 and signed contemporaneously with the Interim Agreement. These modifications included, *inter alia,* a change in the launch deadline from January 1996 to December 1995, a corresponding acceleration of the investment schedule, a 15% cap on INN's contribution to the initial investment requirements and an agreement to give the BBC a 20% equity share in the operating entity. (Russ Hilliard Decl. Ex. 4, ¶¶ 15.1.1, 21.1)

would pay the BBC the following amounts: (i) £3.35 million (the "Basic Payment") in a series of installments beginning January 3, 1995, and ending August 15, 1995; (ii) an additional fee of between £250,000 and £1.5 million in order to pay the BBC's costs in altering or substituting programming; and (iii) all costs associated with the transponder transmission of the "Interim Channel." (*Id.* at 2–5) The Interim Agreement provided also that the BBC could terminate the Interim Agreement if, by January 31, 1995, INN did not have letters from cable systems with an aggregate of at least 500,-000 subscribers indicating an intent to carry the Interim Channel and the Channel. (*Id.* at 5)

According to plaintiff, Russ Hilliard made repeated representations to plaintiff, Blumenthal, Cooper and Young that he would fund the Interim Agreement. (Young Dep. at 73; Schonfeld Dep. at 77–78; Blumenthal Dep. at 82) Two witnesses aver also that at the November 1994 meetings, Russ Hilliard assured all participants that he and his brother, Les Hilliard, would personally fund the Interim Agreement if necessary. (Schonfeld Dep. at 71, 73; Blumenthal Dep. at 65) There is no evidence, however, of the exact wording of the promise to fund. Moreover, it is undisputed that there was no oral or written agreement regarding the form of funding—whether a loan or an equity investment, the total sum of the promised funding, or the liabilities and remedies of the parties in the event of a failure to fund. Even so, plaintiff and the BBC representatives present consistent testimony that when they signed both the Interim Agreement and the December Supply Agreement, they relied upon the Hilliards' promise to provide funding. (Young Dep. at 188–89, 211; Russ Hilliard Dep. 223–24, 299)

Les Hilliard was not at the relevant meetings in November 1994 and did not make an express oral promise to lend or invest any additional funds at that time. (Schonfeld Dep. at 66) Both Young and

Blumenthal testify, however, that they believed that Russ Hilliard was acting on his brother's authority, as he had on several occasions during the INN–BBC negotiations. (Young Dep. at 84–85; Blumenthal Dep. at 72, 161–62) Moreover, Les Hilliard allegedly alluded to the funding promise in conversation directly to Blumenthal. (Blumenthal Dep. at 102) In addition, it is alleged that on at least one occasion Les Hilliard was present when Russ Hilliard confirmed to the relevant parties that the Hilliards would personally fund the Interim Agreement. (Schonfeld Dep. at 35) Les Hilliard allegedly did nothing to disabuse the parties of their belief that Russ Hilliard was authorized to speak on his behalf. (Pl. Mem. in Opp'n at 88)

As the deadline for the first payment drew near, Russ Hilliard spoke directly with Young and said that he would prefer to "extend the time scale by which [the first] payment will be made to the beginning of January." (Young Dep. at 74) Russ Hilliard explained that "because of the Christmas break and his and Les' holiday in Jamaica, they would be unable to get their funds from their bank account into the INN bank account in time to allow the interim agreement to be signed." (*Id.*). On December 15, 1994, Cooper telephoned Russ Hilliard to confirm that the first $1 million payment could be made on January 3, 1995, and the Interim Agreement was put in final form based on that understanding. (Fader Decl. Vol. II, Ex. 58; Young Dep. at 102–04)

As of the middle of January 1995, the Hilliards had made no payments, INN was in default of payments totaling $5 million and the Hilliards had failed to return plaintiff's and BBC's many telephone calls. (Young Dep. at 121–26; Cooper Dep. at 21–22) On February 8, 1995, Russ Hilliard, plaintiff, Young, Cooper and two other representatives of the BBC met in New York to determine whether the breaches of the Interim Agreement and the alleged oral agreement would be rectified. At the meeting, Russ Hilliard did not deny that

he and his brother had promised to fund the Interim Agreement (Cooper Dep. at 44, 62), although he did offer a reason for why the funds were not provided, having to do with the difficulty INN would have obtaining cable operator support. Ultimately, the BBC agreed to release INN without any payment and in exchange, INN dissolved the Interim and December Supply Agreements. (Young Dep. at 99–100, 139–40; Russ Hilliard Decl. Ex. 5)

Plaintiff alleges the Hilliards never intended to fund the Interim Agreement and that they made malicious and willful misrepresentations to conceal that fact. (Am. Compl.¶¶ 70–71) He further alleges that but for the Hilliards' false inducement he would not have abandoned the existing March Supply Agreement to enter into the Interim and December Supply Agreements. (*Id.* ¶ 75)

In April 1995, plaintiff commenced this diversity action pursuant to 28 U.S.C. § 1332(a)(1), alleging derivative claims for fraud, breach of contract, promissory estoppel, breach of the fiduciary duties of loyalty and care, and mismanagement and waste of corporate assets. In addition, he alleges direct claims for breach of contract, promissory estoppel and breach of the fiduciary duties of loyalty and care. (Am. Compl.¶¶ 69–126)

## II.

Before turning to the merits of the Hilliards' summary judgment motion, I address two threshold issues regarding this court's jurisdiction and the law that governs the litigation.

First, I consider whether this court has jurisdiction over the subject matter of plaintiff's claims. *See* Fed.R.Civ.P. 12(h)(3); (Russ Hilliard Reply Mem. at 39–41). The court's subject matter jurisdiction is predicated upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a), which requires that the amount in controversy exceed $75,000. It is undisputed that there exists complete diversity of citizenship. The Hilliards, however, contend

that the amount in controversy, at least under Claims 7 to 10, is less than the jurisdictional minimum and that those claims, therefore, must be dismissed.

The Supreme Court established in *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938), that:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

In shaping the "legal certainty" principle set forth in *St. Paul,* the Second Circuit has noted that

> legal impossibility of recovery must be so certain as virtually to negat[e] the plaintiff's good faith in asserting the claim. If the right to recovery is uncertain, the doubt should be resolved . . . in favor of the subjective good faith of the plaintiff.

*Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir.1994) (citations omitted). The party invoking the jurisdiction of the court has the burden of proof on this issue. *See Chase Manhattan Bank v. American Nat'l Bank,* 93 F.3d 1064, 1070 (2d Cir.1996).

The court's inquiry into jurisdiction is not limited to the face of the complaint, *see McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 181, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), but resort to discovery materials may be used only "to amplify the meaning of the complaint allegations." *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir.1982) (citation omitted). Moreover, any defense asserted on the merits may not be considered or adjudicated on a jurisdictional motion. *See id.* A valid defense, in other words, does not deprive a federal court of

jurisdiction. *See Smithers v. Smith*, 204 U.S. 632, 642, 27 S.Ct. 297, 51 L.Ed. 656 (1907); *Tongkook America*, 14 F.3d at 784.

Although not cited by the Hilliards, there is case law that permits a court when faced with a rule that bars or limits liability, to go beyond the pleadings for the limited purpose of applying that rule to determine the court's jurisdiction. *See, e.g., Pratt Central Park Ltd. v. Dames & Moore, Inc.*, 60 F.3d 350 (7th Cir.1995); *Valhal Corp. v. Sullivan Assoc. Inc.*, 44 F.3d 195 (3d Cir.1995); *Pachinger v. MGM Grand Hotel–Las Vegas, Inc.*, 802 F.2d 362 (9th Cir.1986). The Second Circuit, however, has not adopted this approach.

The controlling law for this court was established in *Zacharia*. In that case, the lower court had dismissed a guest's claim for the value of items deposited in a hotel safe deposit box. *See Zacharia*, 684 F.2d at 201–02. The district court had first determined that a limitation-of-liability policy, signed by the guest, capped recovery below the amount-in-controversy requirement. Then, after finding that the policy was valid under state law, the court dismissed the complaint for lack of subject matter jurisdiction. *See id.* at 202. The Second Circuit reversed, finding that the district court had improperly gone beyond the allegations in the complaint. The Court held that the liability limitation was an affirmative defense, the completeness of which did not deprive the court of jurisdiction, and reiterated that jurisdiction is based on the complaint alone, without considering defenses. *See id.; see also Ochoa v. Interbrew America, Inc.*, 999 F.2d 626 (2d Cir.1993) (noting that, in the absence of a claim of bad faith, the determination of amount in controversy is limited to a plaintiff's complaint).

 The Hilliards base their jurisdictional challenge, in part, on their belief that plaintiff cannot recover for lost profits under New York law. (*See* Russ Hilliard Reply Mem. at 39–41) For the reasons discussed below, I agree that the claim for lost profits must be dismissed. That decision, however, is based on a factual inquiry that goes beyond the complaint, which, as noted, is not permitted on a jurisdictional motion. *See Zacharia*, 684 F.2d at 202. Because it is undisputed that a claim for lost profits is not barred in New York, it is not legally impossible that plaintiff might recover the amounts he claims. Accordingly, I cannot at the present time dismiss this case for lack of subject matter jurisdiction.

The second threshold issue is whether New York or Delaware law governs (i) the issues related to the formation, enforcement and breach of the alleged oral contract to fund, and (ii) the issues of fiduciary status and breach of fiduciary duties.

 It is well established that a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In New York, choice-of-law issues involving contractual disputes are governed by an "interest analysis" or "most significant relationship" test. *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F.Supp. 1051, 1060 (S.D.N.Y. 1996) (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir.1991)); *see also Intercontinental Planning Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576 (1969) (extending New York's traditional "center of gravity" or "grouping of contracts" approach to an interest analysis). Specifically, "the law of the jurisdiction having the greatest interest in the litigation controls." *Id.* In conducting this analysis, a court should consider factors such as (1) the location of contracting, (2) the location of contract negotiation, (3) the location of performance, (4) the location of the subject matter of the contract, and (5) the domiciles, residences, nationalities, places of incorpo-

ration, and the places of business of the parties. *See id.* at 137.

In this case, both parties have assumed that New York law governs the oral agreement; they rely exclusively on New York law to support their respective contentions on contract formation, enforcement, breach and damages. *Cf. id.* at 137 (deciding that parties may consent to the application of New York law by their conduct); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984) (same). Because there is no countervailing public policy that mandates otherwise, I will assume also that New York governs all contractual disputes.

A disagreement does exist, however, as to which law governs plaintiff's breach of fiduciary duty claims. The Hilliards argue that under New York choice-of-law rules, the law of the state of incorporation—here, Delaware law—governs the fiduciary claims. (*See* Russ Hilliard Mem. at 70 n. 11); *see also Walton v. Morgan Stanley & Co.,* 623 F.2d 796, 798 n. 3 (2d Cir.1980) (stating, without analysis, that the law of the state of incorporation applies in fiduciary duty actions (citing *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969))).

Contrary to the Hilliards' assertion, however, New York does not automatically apply the law of the state of incorporation to determine shareholder rights and fiduciary liabilities. In *Greenspun v. Lindley,* 36 N.Y.2d 473, 369 N.Y.S.2d 123, 330 N.E.2d 79 (1975), the Court of Appeals confronted the question of whether New York or Massachusetts law should govern a shareholder's derivative action brought in a New York court against the trustees of a business trust organized under laws of Massachusetts. Although the Court held that Massachusetts law controlled, the court rejected "any automatic application of the so-called 'internal affairs' choice-of-law rule" *Id.* at 478, 369 N.Y.S.2d at 126, 330 N.E.2d 79. Instead, the Court looked to several factors: the state of incorporation, the fact

that the declaration of trust expressly provided for the application of Massachusetts law, and the lack of evidence that the trust had a significant "presence" in New York. *Id.; see also Norlin Corp. v. Rooney, Pace Inc.* 744 F.2d 255, 263 (2d Cir.1984) (restating the analytical framework presented in *Greenspun* ); *cf. Restatement (Second) of Conflicts of Laws* § 309, comment c (stating that the law of a state other than state of incorporation may apply "where the corporation does all, or nearly all, of its business and has most of its shareholders in this other state and has little contact, apart from the fact of its incorporation, with the state of incorporation"). In short "the principles compelling a forum state to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served." *Norlin,* 744 F.2d at 263 (citations omitted).

INN was a corporation organized under the laws of Delaware. Nevertheless, the INN Shareholders Agreement, the only document that provides for corporate governance and shareholder rights and responsibilities, expressly provides that: "This Agreement shall be governed by the laws of the State of New York applicable without regard to the principles of conflicts of laws." (*See* Russ Hilliard Ex. 1, ¶ 13) Thus, New York law is presumptively applicable.

A finding that the parties intended New York law to apply to shareholder claims is consistent also with another provision of the Shareholders Agreement naming New York as the site for any arbitrations. (*See id.* ¶ 6) Moreover, even after the Hilliards asserted that Delaware law governs, both parties continued to cite New York law in support of their contentions regarding the fiduciary duty claims. (*See, e.g.,* Russ Mem. at 63–65; Russ Hilliard Reply at 42; Pl. Mem. in Opp'n at 113 n. 92) Finally, the record reveals significant contacts with New York which support a finding of a New York "presence" by INN. For instance, all documents at issue in this litigation, including the Shareholders Agreement, were drafted in New York;

all significant business meetings, negotiations and announcements took place in New York; and INN's President, Chairman and one-third shareholder is a resident of New York.

Because the Hilliards have shown no distinctions between Delaware law and New York law that raise countervailing issues of public policy, I find no reason to ignore the express choice-of-law term of the Shareholders Agreement. Therefore, I will apply New York law to plaintiff's fiduciary duty actions as well.

### III.

Summary judgment is mandated when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). Nevertheless, Rule 56 jurisprudence is clear in "provid[ing] that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, therefore, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990).

### IV.

#### A. *Recovery of Lost Profits Damages*

Plaintiff seeks damages of approximately $100 to $270 million in lost profits flowing from INN's loss of the December Supply Agreement. (*See* Murphy Aff. Ex. E) The Hilliards move for summary judgment and dismissal of all lost profits claims for (1) lack of evidence to prove lost profits damages with the requisite degree of certainty, and (2) plaintiff's failure to prove that liability for future lost profits was in the contemplation of the parties to the contract at the time it was made. For the reasons discussed below, I agree with the Hilliards on both points and dismiss plaintiff's claims for lost profits.

In an action for breach of contract, the injured party is entitled to the benefit of the bargain, and the recovery may include the profits which he would have derived from performance of the contract. *See Perma Research & Dev. v. Singer Co.,* 542 F.2d 111, 116 (2d Cir.1976). New York law, which controls here, permits recovery of lost future profits as damages, but only under rigorous rules:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

*Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234 (1986) (per curiam) ("*Kenford I*") (citations omitted). For a new business, such as a start-up cable channel, evidence of lost profits receives greater scrutiny for the obvious reason that there does not exist a reasonable basis of experience—*i.e.* historic profits—upon which to

estimate lost profits with the requisite degree of reasonable certainty. *See id.* (citing *Cramer v. Grand Rapids Show Case Co.*, 223 N.Y. 63, 68–69, 119 N.E. 227 (3d Dep't 1918)).

In *Kenford I,* in circumstances highly analogous to those presented here, New York's Court of Appeals articulated the standard for proving lost profits with reasonable certainty. Erie County had entered into a contract with Kenford and its affiliate, Dome Stadium, in which Kenford agreed to convey land to the county for construction of a domed stadium. The county agreed to construct the stadium and to lease it to Dome Stadium for 40 years or, if the parties could not agree upon the terms of the lease, to enter into a 20–year contract under which Dome Stadium would manage the facility. The stadium was never constructed and Dome Stadium sued the county for breach. The Court affirmed the lower court's decision to set aside a jury verdict for $25.6 million for lost profits flowing from the management contract.

In upholding the lower court's decision to set aside the verdict, the Court found no fault with the statistical procedures or data used to calculate the damages—in fact, the Court noted that the proof offered, "unquestionably, represents business and industry's most advanced and sophisticated method for predicting the probable results of contemplated projects." *Kenford I,* 67 N.Y.2d at 261–62, 502 N.Y.S.2d at 133, 493 N.E.2d 234. Even so, the Court found the economic assessment of damages legally insufficient, stating that

> [d]espite the massive quantity of expert proof submitted by [Dome Stadium], the ultimate conclusions are still projections, and as employed in the present day commercial world, subject to adjustment and modification. We of course recognize that any projection cannot be absolute, nor is there any such requirement, but it is axiomatic that the degree of certainty is dependent upon known or unknown factors

> which form the basis of the ultimate conclusion.... Quite simply, the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirement of proof with reasonable certainty.

*Id.* at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234.

*Kenford I* does not absolutely bar the award of lost profits for failed ventures with no profit history, but the *Kenford I* Court refused to enter into the speculative counterfactual required to determine hypothetical revenues over a period of 20 years from performances at a stadium that was never built, by entertainers who were never booked, before an audience that was never developed. The relevant issue, the Court made clear, is one of evidence; hopes and plans are not enough, and the burden is upon the plaintiff to prove lost profits with reasonable certainty.

The second element plaintiff must establish, is that liability for lost profits damages was within the contemplation of the parties at the time the contract was made. The standard rests on an evaluation of what liability is foreseeable and "fairly may be supposed to have assumed consciously" by the defendant given the circumstances of the contract. *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 3, 537 N.E.2d 176 (1989) ("*Kenford II* ") (citations omitted) (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903)).

As discussed below, plaintiff has failed to establish his lost future profits with the degree of certainty required by the New York courts, and he has failed also to establish that liability for such damages was contemplated by the parties at the time of contracting.

### 1. The Requisite Certainty of Losses

■ As a threshold issue, plaintiff argues, through his expert and his lawyers, that the stricter, new business standard of review is inapplicable to this case. The expert opines that the proposed Channel is not a start-up business by industry standards because the crucial programming element, the BBC feed, is well established. (*See* Curtis Dep. at 95) Plaintiff's counsel make the more bald, yet ultimately tangential argument, that because the BBC is not new, the new business standard does not apply to it. (*See* Pl. Mem. in Opp'n at 68–70)

The latter argument, though undoubtedly true, is unenlightening, however, because plaintiff does not seek future lost profits that would have been generated by the BBC operating in its usual venue. Plaintiff's argument is a non-issue. The New York standard for proving a lost profits damage claim is ultimately the same for both new and well-established businesses. The relevant distinction is that a well-established business provides a plaintiff with an evidentiary advantage in establishing the requisite certainty insofar as the performance records of such businesses generally have been held to provide a reasonable foundation for damages. *See, e.g., Cramer,* 223 N.Y. 63, 68–69, 119 N.E. 227 (noting that the owner of an established business may have records upon which a reasonable estimate of injury may be made). When lost profits are sought from a business with no, or limited, profit records, alternative evidence must be presented to establish whether any damages even exist, let alone the amount of damages. Such evidence calls for more tenuous inferences to reach a conclusion on damages, and, therefore, such evidence merits greater scrutiny. *See Kenford I,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d 234; *International Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 86 (2d Cir.1996) ("[T]he new business rule is not a *per se* rule forbidding the award of lost profits damages to new businesses, but rather an evidentiary rule . . . ." (citations omitted)).

It is undisputed that the proposed operating entity has no historic profits from which to extrapolate future earnings for one year, let alone 20 years, into the future. *Cf. Systems Corp. v. American Tel. & Tel. Co.,* 60 F.R.D. 692, 694 (S.D.N.Y. 1973) ("The court recognizes that the general rule is that profits from a business contemplated but not yet established are too remote and uncertain to form the basis of an award."); *676 R.S.D., Inc. v. Scandia Realty,* 195 A.D.2d 387, 387, 600 N.Y.S.2d 678, 679 (1st Dep't 1993) (affirming dismissal of a lost profits claim on the ground that there was no basis upon which to estimate amount because plaintiff was in business for only three months); *Ciraolo v. Miller,* 138 A.D.2d 443, 444, 525 N.Y.S.2d 861, 862 (2d Dep't 1988) (setting aside an "unduly speculative" calculation of lost profits based upon a 12–month projection because plaintiff was a new business).

Because the operating entity has no performance records, plaintiff bases his damage assessment on the business plans and revenue projections INN developed for attracting investors. (*See* Picon Decl. Ex. G) These projections, however, are subject to the same criticism as ones presented to the Court in *Kenford I.* Indeed, plaintiff's damage assessment presumes at least, that: (i) an operating entity would have been formed and operated for 20 years; (ii) an estimated $44 million in pre-launch financing would have been raised; (iii) the hypothetical subscriber levels would have been reached; (iv) carriage agreements would have been entered; (v) advertisers would have been found at the assumed rates; (vi) all projected expenses would have proved correct; (vi) marketing costs would have remained constant and expenditures would have been sufficient to attract and maintain subscriber interest; and (vii) the type and amount of equity interest held by each investor, including INN, would have been determined in the manner plaintiff alleges. (*See* Fader Decl.

Vol. I, Ex. 2A) Each of these presumptions is based on nothing but speculation and conjecture. It certainly cannot be said that plaintiff's lost profits are reasonably certain. *See Kidder, Peabody & Co. v. IAG Int'l Acceptance Group*, 28 F.Supp.2d 126, 134 (S.D.N.Y.1998) (holding that the claimant cannot establish lost profits where its calculation is dependent upon a host of assumptions concerning uncertain contingencies, and applies numerous variables about which an expert can only surmise); *cf. Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906 (2d Cir.1962) (affirming the trial court's exclusion of expert testimony on lost profit damages for failure to support an underlying assumption on market penetration rates); *Target Market Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143–44 (7th Cir.1998) (stating that "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered") (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 516, 519, 139 L.Ed.2d 508 (1994)).

Further, it is significant that the effects of general market risks on the venture's probability of success are not mentioned. For example, plaintiff's assessment does not incorporate a sensitivity analysis of what effect the entry of competitors[5], technology developments, regulatory changes or general market movements

might have on future cash flows. (*See, e.g.*, Curtis Dep. at 56, 61) Indeed, when told that some cable owners are paid to carry a channel, plaintiff's damages expert admitted that if it was necessary to pay for carriage the Channel would not survive (*see* Ackerman Aff. at 110–113), proving that a change in one market variable could in itself undermine plaintiff's calculation.

When there is uncertainty only as to the amount of damages, that question may be submitted to a jury. *See Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir.1977) (restating the rule that "when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages"). However, if the very existence of damages is uncertain, as it is here, recovery is unwarranted because the breach will put plaintiff in a better position than he might reasonably have expected to be in after full performance. *See Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 860, 314 N.E.2d 419 (1974) (articulating the rule that an injured party should not recover more from the breach than he would have gained had the contract been fully performed). Failure to control for adverse market conditions allows the false inference that plaintiff's venture was an assured success and, therefore, that the breach caused injury.[6]

---

**5.** It should be noted that because the December Supply Agreement could be construed as exclusive only to a 24–hour programming feed, the BBC itself posed a potential competitive threat to the INN venture. If the December Supply Agreement was non-exclusive as to smaller blocks of programming, the BBC could sell any choice news coverage at market rates to Channel competitors, thereby diminishing the value of INN's 24–hour BBC feed. Even if at a later date this "cherry-picking" was determined to breach the December Supply Agreement terms, there is already sufficient uncertainty that plaintiff's expert should have considered this potential risk.

**6.** The Hilliards argue also that the evidence provided by Curtis, and by William Grimes, a

cable industry executive, fails to meet the methodological standards for scientific evidence under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court identified four factors for a federal judge to consider in assessing the reliability of scientific studies: (i) whether the technique used can be tested; (ii) whether the technique has been subjected to peer review; (iii) whether the potential rate of error is known; and (iv) whether the technique is generally accepted in the scientific community. *See id.* at 593–594, 113 S.Ct. 2786.

Although the *Daubert* test has been limited to inquiries into the validity of "scientific" testimony, the Hilliards correctly point out that the analytic framework has been expand-

Although plaintiff does not explicitly make the argument, there is some indication that he would support, or at least verify, his damage assessment by reference to the experience of other cable stations. (*See* Ackerman Aff. Ex. 5) New York courts, in fact, have allowed lost profits of a new business to be established by reference to the profits of existing, comparable firms. *See, e.g., Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 277–78 (S.D.N.Y.1978) (establishing a seller's damage for a brewer's breach by reference to sales achieved by comparable, franchised brewers). Plaintiff's expert, Grimes, casually compares the Channel's projected subscriber rates to those of A & E, Discovery, CNN and PBS as well as to new, less established channels such as TLC and the Cartoon Network. (*See* Ackerman Aff. Ex. 5) However, the probative quality of this type of comparative evidence depends on the similarity between the business at issue and the chosen comparables. *See generally* 3 Dan B. Dobbs, *Law of Remedies* § 12.4(3), at 73 (2d ed.1993). A comparison of the contemplated venture with firms that have management in place, actual expenses, carriage arrangements and at least some record of public acceptance, does not support an inference that the contemplated venture would have proved successful.

The selection of a suitable firm, or firms, to compare to an unproved business is a tricky undertaking. The selected firm must be reasonably similar to provide an inference of both likely initial success and continuing profitability. Perhaps for that reason, New York has demanded a high degree of correlation between a start-up firm and an existing firm before allowing the profits of the latter to function as future lost profits evidence for the former. Firms as to which comparisons have been permitted include firms that purvey uniform and established products, or use standardized operating methods; permissible comparisons have been drawn between a new franchisee and other similarly situated franchisees, or between a new subsidiary and its parent firm. *See, e.g., S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 852 (2d Cir.1987) (allowing Nike's own projections of subsidiary's expected profits as evidence of lost profits, when projections were based on Nike's historic record and formed basis of Nike's decision to breach); *Bloor,* 454 F.Supp. at 277–78 (comparison of franchisees). Here, none of the mentioned comparables are in a franchisor/franchisee or a parent/subsidiary relationship with the proposed operating entity. Because there is no evidence that the proffered firms are comparable to the start-up firm at issue here as to their investors, management, marketing costs or

ed to test the validity of economic damage assessments. Most notably, there is persuasive case law from this court rejecting expert testimony on damages for failure to control properly for general market movements. *See In re Executive Telecard Ltd. Sec. Litig.,* 979 F.Supp. 1021 (S.D.N.Y.1997) (finding an expert's methodology not reliable because he failed to conduct an event study or regression analysis to detect whether stock price declines were the result of forces other than the alleged fraud).

The damages assessment technique used in this case is highly suspect. Plaintiff's damages expert, Donald Curtis, a certified public accountant, employed a simple present value analysis of the projected cash flows of the operating entity. Curtis then adjusted the business plan cash flows by 25%, creating a wider range of possible outcomes, and then

calculated the present value of that range with an 8% discount rate to determine damages between $112,040,000 and $269,429,-000. (*See id.* at Ex. H) Curtis did not calculate the percentage risk of failure for newly launched channels, attempted no verification of the business plan's projections and could provide no external justification for the choice of a 25% discount rate. (*See* Ackerman Aff. at 90, 65 and 68)

This technique suffers from the same inadequacy found in *Executive Telecard.* For this and other shortcomings, the technique used probably would not survive a *Daubert* inquiry. However, because I find that plaintiff has failed to establish a foundation for the existence of lost profits damages under the New York standard set forth in *Kenford I,* it is unnecessary to exclude the evidence by applying the *Daubert* standard.

a myriad of other elements necessary for a profitable enterprise, there is no reason to assume that their profits may be treated as comparable for damages purposes.

In addition, the relevance of any comparison is doubtful because the BBC, and all other program providers and distributors, do not sell staples, such as food, for which there is always a presumptive market. They sell entertainment products whose success depends entirely on consumer taste. The heterogeneity of entertainment products, and the volatility of consumer preferences, reduces the relevance of any cross-firm comparisons and increases the difficulty of predicting future hits and misses for even the most savvy of marketers and investors. Indeed, New York courts have been especially loath to award lost profits for entertainment ventures. *See Kenford I,* 67 N.Y.2d at 262–63, 502 N.Y.S.2d at 133, 493 N.E.2d 234 ("[T]he whim of the general public and the fickle nature of popular support for professional athletic endeavors must be given great weight in attempting to ascertain damages 20 years in the future."); *Freund,* 34 N.Y.2d at 383, 357 N.Y.S.2d at 861, 314 N.E.2d 419 (holding that lost book royalties that resulted from a publisher's failure to print were too uncertain even though this was not the author's first work); *Broadway Photoplay Co. v. World Film Corp.,* 225 N.Y. 104, 107, 121 N.E. 756 (1919) (noting that no one can compute in advance the earnings of plays); *cf. Contemporary Mission,* 557 F.2d at 927 (permitting statistical evidence of the continuing sales of 324 similarly successful recordings when the plaintiff's recording had already established its public appeal by reaching number 61 on the music charts). The circumstances of this case do not warrant resort to a more speculative standard.

Perhaps aware of the shaky foundation upon which his damage assessment is based, plaintiff argues that the business plans are sufficient evidence in and of themselves because their reliability, and an assurance of the Channel's success, was guaranteed by the Hilliards' pre-litigation behavior, specifically their willingness to distribute the INN business plans to prospective investors. (*See* Curtis Dep. at 102) To support this premise, plaintiff relies heavily on *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 405, 604 N.Y.S.2d 912, 917, 624 N.E.2d 1007 (1993), where the New York Court of Appeals approved the use of a promisor's projections of gross revenues as the basis for measuring the promisee's damages. However, *Ashland* is easily distinguished. In *Ashland,* the plaintiff, an established financial advisory company, hired Janien to develop a stock selection investment model, Eta. The program was successful in the market test stage and a licensing arrangement was drafted in which royalties were based, in part, on a four-year projection of revenues from the Eta model. The contract guaranteed royalty payments even if Janien left Ashland's employment "for any reason." *Id.* at 400–401, 604 N.Y.S.2d at 914, 624 N.E.2d 1007. The trial court held that Janien was entitled to damages for lost profits based on the projections in the contract. The New York Court of Appeals affirmed on the following basis:

> Ashland itself had enough confidence in its ability to perform to predict minimum amounts of funding which Eta would attract. It agreed to compensate Janien on that basis. Based on this evidence, the court properly relied on the [contract's revenue] projections and the [compensation based on revenue] provisions to hold that defendant had met his burden of proving his lost profits with reasonable certainty.

*Id.* at 406, 604 N.Y.S.2d at 917, 624 N.E.2d 1007.

The plaintiff's evidence in *Ashland* was doubly relevant. First, that evidence demonstrated that compensation based on future profits, and the continuing obligation of Ashland to compensate him even after termination, were within the contemplation of the parties at the time of the contract.

Second, the inclusion of the revenue projections in the contract showed that Ashland, the defendant, was confident in the success of the pre-tested investment model it bought.

Those characteristics are absent here. It is inappropriate to equate the evidentiary significance of the projected net revenues in INN's business plans here, on the one hand, with the revenue forecasts that formed the contractual basis of guaranteed royalty payments in *Ashland*, on the other. At the time Ashland contracted, it was an established company that managed over $1 billion in funds, it had a ready reservoir of data it could convert to Eta and it identified the minimum funds that it intended to transfer into that new product. INN, in contrast, never had control over the revenues that the operating entity might generate, it had no built-in carriage system, no established customer base, no guaranteed advertisers and insufficient capital to complete the project. (Russ Hilliard Decl. Ex. 3, at 2–5) Potential investors in the operating entity received no guarantee of return from either plaintiff or the Hilliards in any manner akin to the guarantee Ashland made to Janien. To the contrary, the INN shareholders recognized that the proposed venture was risky. In the business plans sent to investors, the shareholders spoke, not of their certainty of success, but rather of their general "belief" that the projected revenues eventually would be realized. (*See* Fader Decl. Vol. I, Exs. 2B & 2C) The sophisticated investor understands that a solicitation to invest in a high-risk venture is as much an appeal to faith as to experience. To hold the Hilliards effectively as guarantors against the risks identified in the business plan, solely because their faith was sincere, is contrary to the relevant legal standards and basic economic principles.

Finally, plaintiff emphasizes that his own experience in launching CNN and the Television Food Network provided an assurance of success and a foundation for the reasonable certainty of the INN projec-

tions. In some businesses, notably businesses in the professional services industry, profits depend on factors unique to a plaintiff, such that the plaintiff's own past experience may be the only reliable guide to future profits. *See, e.g., Wade v. Southwestern Bell Tel. Co.,* 352 S.W.2d 460, 461 (Tex.Civ.App.1961) (finding that the income lost by a lawyer when the publisher of a telephone directory breached a contract to list his name under "Attorneys" could not be measured by reference to the profits of another law firm). This is not such a business. Although plaintiff added legitimacy to the project and reduced its uncertainty, future profits would not be the result solely of his efforts. Nor, in view of the difficulty of selecting comparable firms, discussed above, is there sufficient evidence that plaintiff's past cable experience is relevant in this case. Even assuming that plaintiff was able to commit himself full time to the INN project, the deal at issue is multi-layered and complex, involving many personalities, competing interests and marketplace contingencies. Therefore—barring evidence that plaintiff was a media Midas—plaintiff's role as negotiator with the BBC is an insufficient guarantor of the probability of future profits.

### 2. *The Contemplation of the Parties*

Plaintiff's lost profits claim fails also for the independent reason that liability for such damages was not fairly contemplated by the parties at the time of contracting. *See Kenford I,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d 234. Neither the December Supply Agreement nor the Interim Agreement of which the alleged oral agreement is a part mentioned damage calculations. If there is no contract provision governing the availability of lost profits damages as a remedy for breach, New York law requires the court to "consider what the parties would have concluded had they considered the subject." *Id.* at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234. Plaintiff has proffered insuf-

ficient evidence to establish "the heavy responsibility for estimated future profits that he seeks to impose." *Ashland,* 82 N.Y.2d at 404, 604 N.Y.S.2d at 916, 624 N.E.2d 1007.

 Plaintiff argues that the Hilliards accepted liability for lost profits damages related to the December Supply Agreement because they knew that failure to fund the Interim Agreement would jeopardize INN's long-term supply rights. As plaintiff states the standard, a defendant is liable for all foreseeable harms. Therefore, plaintiff reasons, because the anticipated profits under the December Supply Agreement were not only foreseen, but also the basis of the contracts, the Hilliards are liable for loss of those profits. To support this claim, plaintiff cites *Ashland,* 82 N.Y.2d at 403, 604 N.Y.S.2d at 915, 624 N.E.2d 1007, where the Court stated that "[t]he rule that damages must be within the contemplation of the parties is a rule of foreseeability."

Plaintiff misstates the standard because he has failed to examine the *Ashland* Court's analysis of the issue. As presented by plaintiff, the *Ashland* rule would permit imposition of liabilities beyond those the parties agreed upon because to foresee a possible harm is not necessarily to consent to or even to contemplate liability for that harm. *See* 3 Dobbs, *supra,* § 12.4(4), at 83. The danger of imposing an over-broad standard did not exist in *Ashland* because that contract specifically provided for the recovery of damages. Therefore, the parties contemplated damages at the same time they contemplated liability—i.e., at the time they contracted. Even so, the Court applied a "common sense" rule for evaluating the extent of damages within the contemplation of the parties. *Id.* at 404, 604 N.Y.S.2d 912, 624 N.E.2d 1007. That rule was first adopted in a case where the contract was silent as to damages, and was described in the following manner:

In determining the reasonable contemplation of the parties, the nature, pur-

pose and particular circumstances of the contract known by the parties should be considered . . ., as well as "what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that is assumed, when the contract was made."

*Kenford II,* 73 N.Y.2d at 319, 540 N.Y.S.2d at 3, 537 N.E.2d 176 (citations omitted) (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903)).

Applying those principles here, the purpose of entering the contracts was eventually to capture the profits projected under the business plans, but the Hilliards' anticipation of hypothetical profits does not translate into acceptance of full liability for such profits. *See Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 334 (2d Cir.1993) (holding that the knowledge that delay in a project may result in lost profits was insufficient to establish liability for those profits when the record contained no specific evidence of acceptance or even discussion of lost profits liability); *Goodstein Constr. Corp. v. City of New York,* 80 N.Y.2d 366, 375, 590 N.Y.S.2d 425, 430, 604 N.E.2d 1356 (1992) (holding the "the City's knowledge of the details of plaintiff's plans and cost estimates does not suggest that the City was agreeing to underwrite the hypothetical profits from these plans"). There is no assertion that, at the time of contracting, the Hilliards accepted liability for lost profits either in the contemplated interim period or under the December Supply Agreement. The informality of the oral agreement being sued upon, the lack of damage provisions in any of the written agreements, the speculative existence of future profits and the magnitude of alleged damages compared to the amount that was to be invested, all support a finding that liability for 20 years of lost profits was not in the contemplation of the Hilliards. *Cf. Trademark Research Corp.,* 995 F.2d at 334 (stating that the defendant's aware-

ness of the plaintiff's immense down-side risk militates against the conclusion that the defendant would have assumed it); *Kenford I,* 67 N.Y.2d at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234 (finding that evidence surrounding the negotiation and execution of a 20–year management agreement failed to demonstrate that liability for the estimated future profits was within the contemplation of the parties).

\* \* \* \* \* \*

In sum, plaintiff has not proved the existence of damages with reasonable certainty. The operating entity's profits were purely hypothetical, stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and carriers. Even plaintiff's ultimate share of the profits as an equity holder in INN is hypothetical because the percentages to be owned by the original shareholders were to be determined only after investors had been found. In addition, plaintiff has failed to show that damages for lost profits were in the contemplation of the parties to the contract. Because plaintiff has failed to meet the threshold requirements to sustain a lost profits damage claim, all claims for future lost profits are dismissed, and the Hilliards' motions for summary judgment on this issue are granted.

## B. *Recovery of the Market Value of the Supply Agreement*

▮▮ Plaintiff asserts that if his lost profits claims are dismissed, he still is entitled to recover the market value of INN's March Supply Agreement under his fraud action, Claim 1 (Am.Compl.¶¶ 75–76), and to recover the market value of the December Supply Agreement under his derivative claims for breach of contract and waste of corporate assets, Claims 2 and 6. (*Id.* ¶¶ 81, 101) In his derivative and direct claims for breach of fiduciary duties, Claims 9 and 10, plaintiff asks for "actual" damages in the amount of an amount "believed to exceed $10,000,000." (*Id.* ¶¶ 93, 98, 121, 126) Reading the complaint in its entirety, it appears that plaintiff claims no actual damages that might reach this sum except the value of either the March or December Supply Agreement. The recovery sought under plaintiff's derivative claim of promissory estoppel and under his direct breach of contract action, Claims 3 and 7, is vague, but these claims appear also to seek the recovery of the market value of either the March or December Agreement. (*Id.* ¶¶ 87, 109)

In essence, plaintiff seeks to be compensated, not for future lost profits, but for what a willing buyer would pay a willing seller for the profit opportunity represented by INN's 20–year BBC program rights.[7] Defining these contract rights as an existing asset, plaintiff recasts the loss of that asset either as a pecuniary loss directly resulting from the fraud or as a general damage, naturally flowing from the breach of contract. Because general

---

7. Plaintiff is vague about whether he seeks to recover the market value of the March or the December Supply Agreement. Depending on which theory of law plaintiff bases his damages on, he must provide market value assessments for either the March or December Supply Agreement. Accepting *arguendo* that the market value of either agreement is recoverable, the loss of the March Supply Agreement would be the alleged injury under a theory of fraud in the inducement of contract and the loss of the December Supply Agreement would be the alleged injury under a claim of breach of contract or fiduciary duty.

Nevertheless, plaintiff makes no distinction between the two Agreements and presents a market valuation for the March Agreement only. Due to the difference in terms between the two Agreements, establishing a market value for the December Supply Agreement by analogy to the March Supply Agreement, as plaintiff attempts to do, is even more attenuated than the flawed, speculative valuation of the March Supply Agreement actually presented. More important, although plaintiff's theory of recovery is intriguing, the theory is manifested as a second attempt to recover lost profits. Because I have decided that the evidence presented is inadmissable and speculative, I will not fine tune plaintiff's analysis. Therefore, for the purposes of this section, I refer to both agreements in general terms.

damages, unlike expectation damages, are always considered to be in the contemplation of the parties, such a characterization of the programming contract, if adopted, would relieve plaintiff of much of his evidentiary burden to prove future lost profits. But plaintiff does not explain why INN's 20–year programming contract should be distinguished from Dome Stadium's 20–year management rights contract for which the *Kenford I* Court denied recovery. *See Kenford I*, 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d 234. Moreover, even assuming that the programming contract is a definable asset, to recover for its loss plaintiff would still have to prove the asset's value with reasonable certainty. This, again, plaintiff cannot do because the value of that asset depends on its potential to generate profit, which is highly speculative.

Beyond assertions that the programming contract was "a valuable asset," the evidence as to that asset's value relies exclusively on the Cox pre-breach offer for INN's programming rights with the BBC. (*See* Pl. Mem. in Opp'n at 66) Plaintiff presents the Cox offer, not pleading that it was lost due to the Hilliards' alleged fraud (*see* Am. Compl. ¶¶ 70–76), but as an example—indeed the definitive example—of what a willing buyer would pay for the 20–year programming contract. (*See* Pl. Mem. in Opp'n at 102)

Ignoring for the moment the long chain of provable inferences this methodology requires—that the rights are freely assignable, which they are not (*see* Russ Hilliard Decl. Ex. 2, ¶ 21.1), that a market exists for such an investment, which it does not—the valuation of the Cox offer requires that profit projections be used to establish value. Although the offer proposed an up-front payment, most of INN's compensation was contingent on the revenue generated by the two proposed channels in the tenth year of operation. (*See* Fader Decl. Vol. I, Ex. 4A, at 2) To calculate the value of the offer, the expert had to project likely revenues 10 years into the future.

Based on the terms of the Cox offer, and using both the Cox and INN business plan forecasts, the expert calculated a market value range of $17,122,000 to $29,369,000. (Picon Decl. Ex. H)

It is only logical that the certainty rules apply just as firmly to projected profits used to prove market value of an asset as they do when profits are used to prove any other damage claim. Indeed, "profits do not become more certain or more reliable as evidence simply because they are used to prove something else." 3 Dobbs, *supra*, § 12.4(3), at 77. I have already decided that INN's revenue estimates are too speculative to support a lost profits claim. After examining the evidence, I conclude that the Cox forecast of future revenues, used to support an inference for the market value of the programming contract, is also insufficient to prove damages with reasonable certainty.

To be sure, there are aspects of the Cox projections that, if true, arguably render them more certain than the INN forecast: it may be assumed, for example, that Cox has a record of expenses, an established management and a ready distribution system for new programming. Moreover, the profit forecast of interest is for 10, not 20, years into the future. But these assumptions are unique to Cox and the specific terms of the Cox offer; and again, plaintiff does not seek to recover the value of this offer, but rather sues for the market value of the 20–year programming contract. Curtis himself testified that replacing INN's cost projections for those of Cox, even holding all else constant, the Channel could be "a lost venture." (*See* Ackerman Aff. at 86)

To determine a market value for any highly specialized good is difficult. In certain instances, it could be that the offer of a single buyer would be sufficient to permit an inference of value. In this case, however, where, among other things, (i) the offer was never final; (ii) the offer involves revenue projections of an untested entertainment product; (iii) the assignabil-

ity of rights was limited by the need for BBC approval; and (iv) any valuation is highly dependent on the unique character-istics of the hypothetical buyer, a more rigorous valuation methodology is called for.

To support this back-door introduction of future profits projections, plaintiff relies on *Cayuga Harvester, Inc. v. Allis–Chal-mers Corp.*, 95 A.D.2d 5, 465 N.Y.S.2d 606 (4th Dep't 1983). In *Cayuga Harvester*, the Court allowed a farmer to recover for crops lost due to the malfunction of a harvesting machine. After stating the rule that a plaintiff who seeks fraud damages is limited to "actual pecuniary loss," the Court found that recovery of lost profits might be appropriate because

> [a]ny profits that might be included in [plaintiff's] recovery would not be profits from an anticipated resale of the ma-chine or from an expected increase in the value of plaintiff's investment in it ... but rather profits that plaintiff would *normally receive* from its corn crop *if sold at market value* as a return on its investment in labor, seed, fertiliz-er and other expenses in the crop.

*Id.* at 24, 465 N.Y.S.2d at 619 (emphasis added).

This case is easily distinguished from *Cayuga Harvester.* The plaintiff in *Cayu-ga Harvester* was an established corn farmer who bought a harvester that did not operate properly and continued to break down during the harvest season of 1981. *See id.* at 7, 465 N.Y.S.2d at 609. To prove the amount of corn lost, the farmer could offer his own historic yields and the yields of neighboring farmers. The corn price, established by many buy-ers and sellers in the commodity market, was readily ascertained. The market val-ue of the lost yield was simply the corn price multiplied by the amount of lost yield minus forgone expenditures.

In the present case, there are no analo-gous reliable means by which to determine the market value of the 20–year program-ming contract. As discussed above, the operating entity has no historic record of operation and no relevant competitors, and the market price of the programming con-tract is heavily dependent on the private valuations of individual purchasers and in-vestors. More important, plaintiff cannot argue that the $17 to $29 million claimed represents profits INN would "normally receive." The values he claims are based on a hypothetical resale of INN's program-ming rights to another party. Resale, however, was not the stated purpose of the programming contract, the rights were not freely assignable, and a successful resale would have been a fortuitous, not a nor-mal, event. Because plaintiff fails to point to any additional case law to support his claim that the programming contract is a recoverable asset, or to distinguish his claim from a request for lost profits—and even if he could, the valuation is uncer-tain—the claim for recovery of the value of the contract must be dismissed and all expert testimony proffered in support of that claim is excluded as irrelevant and speculative.

## C. *Damage to Business Reputation*

 As part of his direct action for recovery under the doctrine of promissory estoppel, Claim 8, plaintiff seeks damages to his business reputation in an amount to be determined at trial. (*See* Am. Compl. at ¶ 113) However, plaintiff fails to offer support by his own, or corroborating testi-mony, that such damages exist. When asked directly whether he could name one project that he was unable to work on due to his association with INN and the BBC, he could not. (*See* Ackerman Aff. Ex. A, at 534–35) Plaintiff did recall two negative comments about INN and the project, one made by a TV Food Network official, and one made by Nory LeBrun of the Home Shopping Network. (*See id.* at 533–536) Neither of the comments relate to plaintiff personally, and LeBrun himself testified that his opinion of plaintiff was not affect-ed by the INN transactions and LeBrun could cite no missed business opportunities

or disparaging comments about plaintiff. (*See id.* Ex. E at 120) The BBC later hired plaintiff as a consultant, so he can scarcely claim that his standing with the BBC was diminished in a way that caused him damage. (*See* Russ Hilliard Decl. Ex. 5 at ¶ 9)

When responding to a summary judgment motion, a plaintiff may not rely on mere allegations when, as here, the motion is supported by facts and testimony. *See Delaware & Hudson Ry.*, 902 F.2d at 178; *see also Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. Even when asked to supplement his deposition to supply proof of injury to his reputation, plaintiff had nothing to add. (*See* Ackerman Aff. Ex. A at 538) Because plaintiff has not established any damage to his business reputation, this portion of his claim is dismissed.

### D. *Punitive Damages*

The Hilliards move also for summary judgment on plaintiff's demand for punitive damages. Plaintiff seeks punitive damages under his fraudulent inducement claim (Claim 1) as well as under his direct and derivative breach of fiduciary duty claims (Claims 4, 5, 9 and 10). The Hilliards argue that the fraud and breaches of fiduciary duty claims are nothing more than the breach of contract claim recast as an action in tort. Accordingly, they argue, punitive damages should be denied in this case because plaintiff seeks recovery of an alleged private wrong and New York allows punitive damages only when a breach of contract implicates public rights.

The general rule in New York is that punitive damages are not recoverable for an ordinary breach of contract because such actions deal with wrongs between private parties. *See Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 342, 634 N.E.2d 940 (1994). However, in *Rocanova* the New York Court of Appeals explained an exception to the general rule, stating that,

[p]unitive damages are available where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and is sufficiently egregious ... to warrant the additional imposition of exemplary damages. Thus, a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.

*Id.* at 613, 612 N.Y.S.2d at 342–43, 634 N.E.2d 940 (citations omitted). This court has synthesized the *Rocanova* analysis into a two part test that permits punitive damages when (1) there has been egregious and independently actionable tortious conduct by the defendant and (2) such conduct was part of a pattern of conduct directed at the general public. *See In re West 56th Street Assocs.*, 181 B.R. 720, 724 (S.D.N.Y. 1995).

In satisfaction of the first element, the challenged conduct must evince a " 'high degree of moral turpitude' and demonstrat[e] 'such wanton dishonesty as to imply criminal indifference to civil obligations' " *Rocanova*, 83 N.Y.2d at 612, 612 N.Y.S.2d at 343, 634 N.E.2d 940 (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497 (1961)) To support a claim of punitive damages a claim of "[m]ere fraud is insufficient" because "punitive damages [are] available only where [the] defendant acts with evil and reprehensible motives." *Wallach Marine Corp. v. Donzi Marine Corp.*, 675 F.Supp. 838, 842 (S.D.N.Y.1987). Similarly, in a claim of breach of fiduciary duty, a plaintiff must allege circumstances that prove a defendant's conduct is "sufficiently blameworthy" to warrant punitive damages. *Doe v. Roe*, 190 A.D.2d 463, 475, 599 N.Y.S.2d 350, 356 (4th Dep't 1993). The second element, whether there is a pattern of

conduct aimed at the public, is not an issue and requires no further explanation.

The challenged conduct in this case fails to satisfy even the first element of the *Rocanova* test. First, the record does not support a finding that the Hilliards "willfully" or "recklessly" breached the alleged promise to fund. There is intense dispute between the Hilliards and plaintiff regarding both the existence of a promise to fund, and the scope of obligations under that alleged promise. This is, therefore, not a case where a defendant blatantly violated a clear obligation; rather, it is a case in which the Hilliards' obligations, if any, are so undefined that a trial would be required to clarify them. *See In re West 56th Street Assoc.*, 181 B.R. at 727 (finding that the contract at issue was too ambiguous for any breach to be "willful"). Second, there is no evidence of "malicious" or "blameworthy" conduct. It is undisputed that *all* the parties agreed that, given the change in FCC rules, moving up the programming schedule was, in essence, a sound business decision. At the time of the alleged breach, the Hilliards, for their part, had far more invested in INN in both years of planning and capital investment, than did plaintiff. Any failure of the venture and any harm to INN as a corporation, would have been to the Hilliards' detriment, not their benefit. Therefore, this is neither a case of self-dealing nor a case in which a fiduciary would not be personally harmed by his own reckless behavior. *Cf. Giblin*, 73 N.Y.2d at 772, 536 N.Y.S.2d at 55, 532 N.E.2d 1282 (affirming that defendant' wrongful diversion and squandering of corporate assets, payments of salaries to themselves, and other acts warranted the imposition of punitive damages). The parties' ongoing unity of purpose, supports a finding that the Hilliards could not have had "evil intent." To decide otherwise would be to find that the Hilliards had been working against their own best interests.

Moreover, it is uncontested that the second element of the *Rocanova* test is not satisfied because this action does not allege conduct directed at the general public. In fact, given my decisions regarding plaintiff's damage claims, plaintiff cannot even prove a private injury. Nevertheless, plaintiff argues that this second element is not required under New York law because several courts have awarded punitive damages even in the absence of a public wrong. *See Aero Garage Corp. v. Hirschfeld*, 185 A.D.2d 775, 777, 586 N.Y.S.2d 611, 613 (N.Y.A.D.1992) (holding that where the defendant "were fully aware from the outset that their actions were blatantly in breach of the agreement with plaintiff and yet displayed their willingness to go to any lengths" to achieve their goal, punitive damages for breach of contract was appropriate); *Giblin v. Murphy*, 73 N.Y.2d 769, 536 N.Y.S.2d 54, 532 N.E.2d 1282, (1988) (affirming lower courts decision to allow punitive damages in the absence of public harm when defendant had recklessly and repeatedly breached their fiduciary duties by diverting corporate funds to themselves and conducted an "out-and-out fraud"); *see also Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir.1991) ("Under New York law, punitive damages are appropriate in cases involving 'gross, wanton or willful fraud or other morally culpable conduct.' Such conduct need not be directed at the general public.") (citations omitted).

It is doubtful that these cases accurately express New York law given the decision of New York's highest court in *Rocanova*. *See Parke–Hayden, Inc. v. Loews Theatre Management Corp.*, 789 F.Supp. 1257, 1267 (S.D.N.Y.1992) (noting that the cases that do not require a public wrong for an award of punitive damages "run decidedly against the grain of prevailing New York law"). However, even assuming that these cases remain valid, plaintiff's claims for punitive damages fail because, as I have already found, the Hilliards' conduct does not constitute the morally culpable behavior demonstrated in the very cases upon which plaintiff relies. Accordingly, plain-

tiff's claims for punitive damages in Claims 1, 4, 7, 9 are dismissed.

\* \* \* \* \* \*

Under his breach of contract claims, Claim 2 and 7, and claims of breach of fiduciary duties, Claims 4, 5, 6, 9, and 10, plaintiff seeks no relief other than lost profits, "actual" damages—equivalent to the market value of the programming contract—and punitive damages. As discussed above, plaintiff has failed to introduce sufficient evidence in support of these claims for damages and, therefore, the underlying claims are dismissed for failure to show injury. *See, e.g., Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1060 (S.D.N.Y.1996) (listing proof of damage to the plaintiff as an essential element of a breach of contract claim); *S & K Sales Co.,* 816 F.2d at 847–48 (same in a breach of fiduciary duty action). Likewise, under his promissory estoppel claims, Claims 3 and 8, plaintiff requests combinations of lost profits, "actual" damages, punitive damages and damage to his business reputation. Again, these damages claims are unprovable or barred as a matter of law and, accordingly, the promissory estoppel claims are dismissed for failure to show injury. *See, e.g., Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989) (listing injury to plaintiff as a necessary element of a claim for promissory estoppel).

## V.

▮▮▮▮ Plaintiff's one remaining claim is for fraud, Claim 1. To establish a cause of action for fraud, plaintiff must prove that the Hilliards made a materially false representation with intent to deceive, that plaintiff reasonably relied on that assertion and incurred some "out-of-pocket" injury from his reliance. *See CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 285, 519 N.Y.S.2d 804, 812, 514 N.E.2d 116 (1987) (listing the elements of a fraud action and noting that reliance must be reasonable); *Nottenberg v. Walber,* 160 A.D.2d 574, 575,

554 N.Y.S.2d 217, 218 (1st Dep't 1990) (same); *cf. Ostano Commerzanstalt v. Telewide Sys., Inc.,* 794 F.2d 763, 766 (2d Cir.1986) (holding that, in a New York fraud action, a plaintiff may be awarded only out-of-pocket rather than expectation damages).

Plaintiff has provided four witnesses who testify that the Hilliards promised to fund the Interim Agreement and "but for" that promise the BBC would not have signed the Interim or December Supply Agreements. (*See* Schonfeld Dep. at 35; Blumenthal Dep. at 65; Young Dep. at 73–74, 101, 188–89, 211; Cooper Dep. at 8). Plaintiff provides evidence also that the Hilliards' promise to fund was false and that the Hilliards always intended to find third-party funding. (*See* Les Hilliard Dep. at 106; Russ Hilliard Dep. at 223–24, 299, 315) The record would support, therefore, a finding that the Hilliards made a material false representation with intent to deceive and that plaintiff relied on that representation.

As for the reasonableness of plaintiff's alleged reliance, there is some indication that the Hilliards had the means by which to fulfill the promise to fund—for example, each brother owns a valuable cable company, Russ Hilliard claimed to have purchased a $7 million plane and to own a vacation home in Jamaica. (*See* Schonfeld Dep. at 69, 575; Dickinson Dep. at 244; Young Dep. at 65–66; Cooper Dep. at 10) Whether or not this evidence of wealth justified reliance is an issue of fact for a jury to decide. *See, e.g., Polycast Tech. Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244, 253 (S.D.N.Y.1992) (holding that whether or not a plaintiff's reliance is reasonable, is a question of fact); *Stratford Group, Ltd. v. Interstate Bakeries Corp.,* 590 F.Supp. 859, 865 (S.D.N.Y.1984) (same).

The last element of a fraud action, a showing of "out-of-pocket" injury, deserves separate treatment. With plaintiff's claim for the market value of the programming contract dismissed, plaintiff's only surviv-

ing damage claim under his fraud action is for travel expenses of approximately $15,-000. (*See* Schonfeld Dep. at 289–94; Pl. Mem. in Opp'n at 102 n. 82) This is the full extent of plaintiff's possible recovery because demands for punitive damages have been stricken also. Nevertheless, it is irrelevant that the alleged injury is slight, as any out-of-pocket injury is sufficient to prevent the fraud action from being summarily dismissed.

\* \* \* \* \* \*

For the reasons set forth above, defendant' motion is granted in part and Claims 2 through 10 in plaintiff's amended complaint are dismissed. Defendant' motion for summary judgment on plaintiff's claim of fraud, Claim 1, is denied.

SO ORDERED: