**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 29 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

| | |
|---|---|
| LIFEWISE MASTER FUNDING, a Delaware limited liability company; LIFEWISE FAMILY FINANCIAL SECURITY, a Utah corporation, | No. 03-4086 |
|     Plaintiffs-Counter-Defendants - Appellants, | |
| v. | |
| TELEBANK, now known as E Trade Bank, a federally chartered savings bank, | |
|     Defendant-Counter-Claimant - Appellee. | |

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 00-CV-495-B)**

---

Thomas E. Plank, University of Tennessee College of Law, Knoxville, Tennessee, and Brent V. Manning, (Candice Anderson Vogel, with him on the brief, and Sammi V. Anderson, on the brief, Manning, Curtis, Bradshaw and Bednar, L.L.C., Salt Lake City, Utah), for Plaintiffs-Counter-Defendants - Appellants.

Barkley Clark and Douglas Lobel (and Patrick D. Conner, Morgan, Lewis & Bockius, L.L.P., on the brief, McLean, Virginia), for Defendant-Counter-Claimant - Appellee.

---

Before **EBEL**, **KELLY**, and **McCONNELL**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiffs-Appellants LifeWise Master Funding, LLC and LifeWise Family Financial Security, Inc. (collectively "LifeWise") appeal the district court's grant of judgment as a matter of law and summary judgment against them in their breach of contract claim against Defendant-Appellee E*TRADE Bank ("E*TRADE"). The district court held that (1) LifeWise failed to satisfy a condition precedent to E*TRADE's provision of funding under the contract, and (2) LifeWise failed to produce an admissible damages model attributable to its lost profits. We have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons stated below, we affirm.

## Background

### A.    Factual Background

LifeWise was in the business of lending money to terminally ill patients. The company began business in 1996 by acquiring the assets of a prior viatical company. V Aplt. App. at 2577. Its business plan involved making loans in the form of lines of credit to terminally ill borrowers who pledged their life insurance policies as collateral. When a borrower died, the amounts drawn from the line of credit were deducted from the value of the insurance policy, plus interest and

fees.

Effective December 31, 1998, LifeWise and E*TRADE's predecessor, Telebank, entered into a Funding Agreement that allowed LifeWise to obtain up to $200 million from Telebank over seven years. See I Aplt. App. at 239-88. This arrangement was also known as the "Facility." Under the Facility, Telebank would serve as LifeWise's long-term "takeout lender." This meant that when LifeWise made a loan, it would draw from its own funds or from its short-term lender, Bank One. XII Aplt. App. at 5319-21. Once it originated $1.75 million in loans, LifeWise would make a funding request from Telebank. Id. at 5321-22. LifeWise would sell its loans to a wholly-owned subsidiary, LifeWise Master,[1] which in turn obtained funds from Telebank, V Aplt. App. at 2578, and placed the policies in trust with Bankers Trust Company under a Trust Indenture, XV Aplt. App. at 6544-654. The sale of loans from LifeWise Family to LifeWise Master was governed by a Loan Sale Agreement. II Aplt. App. at 734-58. Later, when a borrower died, Telebank would first be paid in full from the proceeds of the life insurance policy, and then LifeWise would receive its interest and fees. V Aplt. App. at 2578-79.

The Funding Agreement imposed several conditions that the parties were to

---

[1]LifeWise Master was formed as a "bankruptcy remote" subsidiary, so that the bankruptcy of the parent, LifeWise Family, would not affect its assets. XV Aplt. App. at 6549.

meet before any funding was required to be provided. Section 4.10 of the Agreement gave Telebank the right to determine whether LifeWise's general business operations were unsatisfactory to it, and if so, the reasons for the dissatisfaction were to be provided to LifeWise in writing in reasonable detail.[2] Additionally, Section 9.8(b) prohibited LifeWise from allowing any liens[3] to be placed on the policies that were placed in trust as collateral for Telebank's advances.[4]

_____

[2]Section 4.10 provided:
The Initial Investor shall have determined that the underwriting policies and procedures of LifeWise and the general business operations of LifeWise are satisfactory to it. If not so satisfactory, the Initial Investor shall disclose to the Company in writing, in reasonable detail, the reasons for such determination.
I Aplt. App. at 259.

[3]Section 12 defined "lien" to include
any interest in property securing an obligation owed to . . . any Person other than the owner of the property . . . whether or not such interest shall be recorded or perfected and whether or not such interest shall be contingent upon the occurrence of some future event or events . . . and including the lien, privilege, security interest or other encumbrance . . . .
I Aplt. App. at 277.

[4]Section 9.8(b) provided:
Except for the conveyances under the Indenture, LifeWise will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien on the Trust Property or any interest therein (other than Permitted Liens), and LifeWise shall defend the right, title, and interest of the Company and the Trustee in, to and under the Trust Assets against all claims of third parties claiming through or under LifeWise; provided however, that LifeWise's obligations under the Section

During 1999, the first year in which the Facility was in place, the arrangement ran smoothly. In January 2000, Telebank merged with E*TRADE Bank, and concerns were soon raised within E*TRADE about LifeWise's business operations. Various meetings were held in early 2000 between E*TRADE and LifeWise personnel.

On April 28, 2000, E*TRADE sent a letter to LifeWise invoking its right under § 4.10 of the Funding Agreement to delay funding to LifeWise until it became satisfied with the general business operations of LifeWise. XV Aplt. App. at 6667-68. The one-and-a-half page letter addressed E*TRADE's dissatisfaction with LifeWise's low rate of loan production, failed marketing campaign, inability to attract investors, unrestrained spending, and overall losses. After E*TRADE's continued refusal to provide funding, LifeWise filed this lawsuit in June 2000.

B.      Procedural Background

During pretrial proceedings, LifeWise submitted a total of four damages models to the district court. The first model was based on the written report of Mr. Merrill Norman, LifeWise's damages expert. I Aplt. App. at 309-63. Upon E*TRADE's motion in limine, V Aplt. App. at 2100-454, the district court

---

9.8 shall terminate upon the repayment in full of the Notes and the expiration of any applicable preference period.

I Aplt. App. at 267.

excluded the testimony of Mr. Norman on the basis of Federal Rules of Evidence 403 and 702, and the rule set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). VIII Aplt. App. at 3530-43. LifeWise then presented its second damages model, based on the testimony of Mr. Mark Livingston, its Chief Executive Officer. Id. at 3567-97, 3695-727. This too immediately met with a challenge from E*TRADE, and the district court concluded that this second submission was also inadmissible under Rule 702, Daubert/Kumho, and New York law's reasonable certainty standard, see Schonfeld v. Hilliard, 62 F. Supp. 2d 1062, 1071-72 (S.D.N.Y. 1998), rev'd in part, 218 F.3d 164 (2d Cir. 2000). VIII Aplt. App. at 3841-47. At the district court's invitation, LifeWise submitted a third damages model, id. at 3735-840, 3848-924, which was met by E*TRADE's Motion for Summary Judgment for lack of damages, IX Aplt. App. at 3925-4132. Although the district court denied E*TRADE's motion, it rejected LifeWise's damages model, which was based on regression analysis, pursuant to Rule 702. XIII Aplt. App. at 5970-79. The district court gave LifeWise one final chance to produce an acceptable damages model. Id. at 6025-27.

LifeWise's fourth and final damages model was submitted to the district court on September 13, 2002. X Aplt. App. at 4501-647. As could be expected, E*TRADE once again moved for summary judgment on damages. XI Aplt. App.

at 4898-5118.  The district court took E*TRADE's motion under advisement and also ordered that the trial be bifurcated.  XIV Aplt. App. at 6222-48.

Trial was held December 2-20, 2002, and focused primarily on LifeWise's main claim, that E*TRADE denied funding in bad faith for pretextual reasons unrelated to LifeWise's poor business operations.  The jury rejected this claim, finding that E*TRADE's denial was not in bad faith, and LifeWise does not challenge this finding on appeal.  XIII Aplt. App. at 5592-93.  The jury also found, however, that E*TRADE's letter to LifeWise explaining its dissatisfaction with LifeWise's business was not sufficiently detailed.  Id.

After the jury verdict as to liability, E*TRADE filed a motion for judgment as a matter of law, arguing that it had no obligation to provide funding to LifeWise because LifeWise violated § 9.8 of the Funding Agreement by placing liens on E*TRADE's collateral.  XII Aplt. App. at 5294-402.

On March 5, 2003, the district court granted both of E*TRADE's pending motions.  XIII Aplt. App. 5594-666.  On the motion for judgment as a matter of law, the district court ruled that LifeWise violated Section 9.8 of the Funding Agreement by placing liens on the collateral that secured repayment of E*TRADE's funding advances.

On the summary judgment motion regarding damages, the district court held that LifeWise's September 13, 2002, damages model was unduly speculative

under New York Law, unreliable and not helpful under Rule 702, and unduly prejudicial under Rule 403. The district court also held that LifeWise CEO Mark Livingston, its only designated expert, was not qualified under Rule 702 to testify to the September 13, 2002, damages model.

The district court entered judgment for E*TRADE on March 24, 2003. This appeal followed.

## Discussion

A.    The Liens Issue

In early 1999, LifeWise asked its Chairman Michael Salzhauer for financial assistance. On April 1, 1999, LifeWise obtained a $5 million loan from Benjamin Partners ("BP"), a Salzhauer family partnership, by executing a Security Agreement, XV Aplt. App. at 6716-37, and a Note Purchase Agreement, id. at 6690-715.[5] In the Security Agreement, LifeWise Family granted BP a security interest in "all assets"[6] of LifeWise, including LifeWise's interests in the policies

---

[5]The Funding Agreement between LifeWise and E*TRADE was governed by New York law, I Aplt. App. at 282; the Note Purchase Agreement and the Security Agreement (both of which were between LifeWise Family and BP) were governed by Utah law, XV Aplt. App. at 6712, 6732; the Loan Sale Agreement between LifeWise Family and LifeWise Master was governed by New York Law, II Aplt. App. at 751; and the Trust Indenture between LifeWise and Bankers Trust was also governed by New York law, XV Aplt. App. at 6564.

[6]Specifically, LifeWise pledged "all assets of the Debtor . . . , whether now owned or existing or hereafter acquired, owned, existing or arising (whether

held by Bankers Trust that secured E*TRADE's advances.  XII Aplt. App. at 5351.  LifeWise does not dispute that liens were placed on the policies.  XV Aplt. App. at 6736.  On December 31, 2000, another Salzhauer family entity, Combined Partnership, was substituted as the secured party in the Security Agreement.[7]  XII Aplt. App. at 5396-97.

E*TRADE did not discover the liens on the policies until after this lawsuit was filed, during the deposition of LifeWise's Chief Financial Officer, Mr. Syver Norderhaug.  XV Aplt. App. at 6788-94.  Three weeks later, on April 1, 2001, LifeWise and Combined Partnership executed an Acknowledgment and Confirmation.  Id. at 6736-37.  The document acknowledged that "LifeWise granted Combined Partnership a security interest in . . . LifeWise's rights under certain Life Insurance Policies," but that "Combined Partnership wishes to disclaim any and all right, title or interest in the Life Insurance Security Interest, if any such interest ever existed."  Id.

The Security Agreement listed two ways in which BP's lien could be released.  First, under § 7, the liens could be released if "the Secured Obligations have been paid in full."  Id. at 6728.  Second, under § 11, BP could unilaterally

_____

acquired by contract or operation of law) and wherever located . . . including, without limitation . . . [a]ll of Debtor's right, title and interest in any and all Life Insurance Policies . . . ."  XII Aplt. App. at 5351.

[7]Unless otherwise indicated, both BP and Combined Partnership will be referred to as BP in this opinion.

decide to surrender the collateral.  Id. at 6729.  LifeWise concedes that neither of these conditions was met.

LifeWise argues, however, that BP's lien was released pursuant to § 5.6 of the Security Agreement, coupled with Section 9-306(2) of the Uniform Commercial Code, Utah Code Ann. § 70A-9-306(2) (1999).[8]  Section 9-306(2) provided that "a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof <u>unless the disposition was authorized by the secured party in the security agreement</u> or otherwise, and also continues in any identifiable proceeds including collections by the debtor."  (emphasis added).  Section 5.6 of the Security Agreement, wherein BP authorized disposition of the collateral by LifeWise Family in certain cases, states:

> Debtor will not sell, assign, transfer or otherwise dispose of any material portion of the Account or Contracts, which constitute a part of the Collateral, or attempt, offer or contract to do so <u>except</u>, so long as no Event of Default has occurred and is continuing, for the disposition of such accounts and Contracts [1] in the ordinary course of business [2] to third party purchasers [3] <u>without recourse</u> to the Debtor.

XV Aplt. App. at 6726 (emphasis added).

---

[8]Effective July 1, 2000, UCC Article 9 was repealed from the Utah Code and superceded by "Article 9A," Utah Code Ann. §§ 70A-9A-101 et seq.  <u>See</u> <u>WebBank v. Am. Gen. Annuity Serv. Corp.</u>, 54 P.3d 1139, 1142 n.3 (Utah 2002) (citing S.B. 168, 53d Leg., Gen. Sess., 2000 Utah Laws 866-943).  However, the former Article 9–specifically § 9-306(2)–was in effect at the time the Security Agreement was signed and effective.  XV Aplt. App. at 6717, 6734.

The dispute in the present case therefore focuses on whether the assignment of loans from LifeWise Family to LifeWise Master was "without recourse" and thus authorized by BP. If the disposition of the policies was authorized by BP, such authorization would extinguish any security interest BP would have had in the policies, and the policies would therefore be unencumbered when transferred to Bankers Trust as collateral.

The district court granted judgment as a matter of law to E*TRADE on the liens issue. We review a grant of a judgment as a matter of law de novo, applying the same standard as the district court. Hyler v. Geo-Seis Helicopters, Inc., 269 F.3d 1190, 1193 (10th Cir. 2001). A motion for judgment as a matter of law may be granted if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).

LifeWise argues that when LifeWise Family transferred the life insurance policies to LifeWise Master and thereafter to Bankers Trust, any lien that was on the policies was terminated pursuant to UCC § 9-306(2) because BP authorized such disposition under § 5.6 of the Security Agreement.

As a preliminary matter, we note that E*TRADE argues that because § 5.6 nowhere expressly released the liens, no release was ever created. Aplee. Br. at 35-36. This is unpersuasive. According to E*TRADE, no release occurs absent

the requisite words of release, discharge, or renunciation. However, the cases cited by E*TRADE all relate to releases from tort liability. See State v. Upstate Storage, Inc., 535 N.Y.S.2d 246, 248 (N.Y. App. Div. 1988); Carpenter v. Machold, 447 N.Y.S.2d 46, 46-47 (N.Y. App. Div. 1982); Simonson v. Travis, 728 P.2d 999, 1002 (Utah 1986). It is well settled, however, that under UCC § 9-306(2), a lienholder who authorizes the sale of property in which he has a security interest waives the lien on the collateral. See First Fin. Co. v. Akathiotis, 249 N.E.2d 663, 665 (Ill. App. Ct. 1969); Lisbon Bank & Trust Co. v. Murray, 206 N.W.2d 96, 97 (Iowa 1973); Whirlpool Corp. v. Dailey Constr., Inc., 429 S.E.2d 748, 750 (N.C. App. Ct. 1993). No magic language of release is required; indeed, courts have even terminated security interests simply by implying authorization from a party's conduct. See, e.g., Lisbon Bank, 206 N.W.2d at 99. E*TRADE has provided us with no contrary authority applying a stricter standard.

We now turn to whether LifeWise Family's assignment of the loans and the underlying security interests in the policies was in accordance with § 5.6 of the Security Agreement. As stated above, § 5.6 required that dispositions be (1) in the ordinary course of business, (2) to third party purchasers, and (3) without recourse to LifeWise.

There can be no serious dispute that the first two requirements of § 5.6 were met in the transfer of the loans to LifeWise Master. LifeWise Master is a

distinct and separate legal entity from LifeWise Family. Moreover, as the Loan Sale Agreement stated, LifeWise Master was "formed . . . for the sole purpose of acquiring certain . . . loans secured by related life insurance policies," and LifeWise Family "intend[ed] to sell or contribute [the] loans" to LifeWise Master. II Aplt. App. at 736. Thus, LifeWise sold its loans "in the ordinary course of business" and to a "third party purchaser."

E*TRADE, however, attempts to argue that the first two requirements are not met because (1) a "purchaser" requires a "sale," and that no "sale" was made between LifeWise Family and LifeWise Master because the transfer of the policies constituted, in part, a capital contribution by LifeWise Family under the Loan Sale Agreement, (2) life insurance policies are not "goods" and therefore cannot be purchased in the ordinary course of business, and (3) LifeWise Family is not in the business of selling insurance policies. Aplee. Br. at 39-43. E*TRADE arrives at these three arguments by equating the requirement in § 5.6 that the dispositions be made "in the ordinary course of business to third party purchasers" to the definition of a "buyer in the ordinary course" in UCC § 1-201(9), Utah Code Ann. § 70A-1-201(9). That provision, however, concerns purchasers of goods, and, as E*TRADE states, insurance policies are not "goods." Aplee. Br. at 42. But the Security Agreement and specifically § 5.6 both concerned the life insurance policies on which BP had a lien. Therefore, to apply

§ 1-201(9)'s definition of "buyer in ordinary course" onto § 5.6 would render the section a nullity.

As for the third requirement, the Loan Sale Agreement is again instructive: Section 2(i) states

> [1] <u>Except as specifically provided for herein</u>, [2] the sale and the purchase of the Loans under this Agreement is <u>without recourse</u> to any Seller; [3] <u>provided that the Seller shall be liable to the Purchaser for all representations, warranties, covenants and indemnities made by it under this Agreement</u>.

II Aplt. App. at 744 (emphasis added). Following § 2(i) is a list of seventeen representations and warranties that survived the sale of any loan.

The district court essentially held that because § 2(i) has an "except" clause and a "provided that" clause, the sale of loans was not "without recourse." The court reasoned that if the sale were truly without recourse, "the provision would have stated simply that 'the sale and the purchase of the Loans under this Agreement is without recourse to any Seller.'" XIII Aplt. App. at 5649.

We conclude that the district court erroneously interpreted the phrase "without recourse." "Recourse" refers only to the liability of a seller of receivables to the purchaser if the underlying obligors fail to pay the receivables. A seller disclaims this liability, known as "credit liability," by selling the receivables "without recourse." See Thomas E. Plank, <u>The True Sale of Loans and the Role of Recourse</u>, 14 Geo. Mason L. Rev. 287, 289 (1991). However,

although the sale of receivables "without recourse" releases the seller from liability in case of the debtor's insolvency, the seller <u>retains liability</u> for breach of warranty, or "warranty liability."[9]  <u>See</u> <u>id.</u> at 306.  As the Oklahoma Supreme Court stated,

> the term "no recourse" or "without recourse" in an assignment does not, without more, evidence an intent to disclaim the implied warranty of genuineness and validity, but is meant only to make clear the assignor does not guarantee the debtor's solvency or that the debtor will fulfill his obligation.

<u>Indiana Nat'l Bank v. State Dep't of Human Servs.</u>, 880 P.2d 371, 380 (Okla. 1994); <u>see also</u> <u>Gen. Elec. Credit Corp. v. Air Flow Indus., Inc.</u>, 432 So.2d 607, 609 (Fla. App. Ct. 1983) ("implied warranties are not affected . . . by the fact that the assignment was made 'without recourse.'"); 12 C.F.R. pt. 3, app. A, § 4(a)(11) & (a)(3)(iii) (excluding from definition of "recourse" "[w]arranties that permit the return of assets because of fraud, misrepresentation, or incomplete documentation").

Thus, even in a non-recourse assignment, there is still an implied warranty that, for instance:

- the chose assigned is a valid and genuine obligation of the parties;

---

[9]E*TRADE claims that LifeWise raises the differences between credit liability and warranty liability for the first time on appeal.  Aplee. Br. at 45.  This is doubtful, considering the district court's extensive discussion of the matter.  <u>See</u> XIII Aplt. App. at 5650-52.

- the right assigned actually exists and is subject to no limitations or defenses other than those stated or apparent at the time of the assignment;
- the right assigned is based on adequate consideration;
- any evidence of the right delivered as part of the assignment, or exhibited as an inducement to accept the assignment, is genuine and what it purports to be.

6 Am. Jur. 2d Assignment § 158 (footnotes omitted); see also Wait v. Williams, 91 S.E. 969, 970 (S.C. 1917); Restatement (Second) of Contracts § 333.

Contrary to the district court's and E*TRADE's position, the warranty made by LifeWise Family to LifeWise Master in § 5(i) of the Loan Sale Agreement does not convert the sale from a nonrecourse assignment to a recourse assignment. Section 5(i) provides that, if LifeWise Family breaches one of the seventeen representations and warranties that "materially and adversely affects" a loan, LifeWise Family must "immediately repurchase" the loan from LifeWise Master. The section merely provides a remedy if LifeWise Family breached an express warranty or made a false representation; it does not allow recourse against LifeWise Family simply for the obligors' insolvency or failure to pay. The seventeen representations and warranties act as an inducement for LifeWise Master to accept the assignment; even in a nonrecourse assignment, LifeWise Family must warrant that those representations are genuine. See Penowa Coal Sales Co. v. Gibbs & Co., 85 A.2d 464, 467 (Md. 1952).

In deciding that the LifeWise Family's sale of the loans to LifeWise

Master was not without recourse, the district court also reasoned that

> were the Court to interpret the "except for" and the "provided for" clauses as not providing "recourse" in this case, they would convey no new rights to LifeWise Master than it was already entitled to as a matter of contract law. However, New York law disfavors contract interpretations that render provisions of a contract superfluous.

XIII Aplt. App. at 5652. We disagree.

First, the seventeen representations and warranties in the Agreement are specific to this transaction. Their incorporation into the part of the Agreement that details the parties' liability is therefore not superfluous. Moreover, while the "except for" and "provided that" language technically may not be necessary as a matter of contract law, their placement along with the "without recourse" language reinforces and confirms LifeWise Family's responsibilities under the Agreement. Indeed, sellers frequently specify that a sale of a receivable is "without recourse," even when they sell with express warranties. See, e.g., 1 U.C.C. Legal Forms § 2:174 (Assignee's Right to Payment); 3 U.C.C. Legal Forms § 9:473 (Assignment Without Recourse). LifeWise's argument that such redundancy in contracting language is common to avoid frivolous litigation is given greater weight in light of the fact that "without recourse" is often found in assignment contracts but also simply restates the law of assignment. See 29 Williston on Contracts § 74:8 ("[When using the phrase 'without recourse,'] the assignor is only seeking to make certain what the law would indeed, in any event,

imply from mere assignment, that the assignor is not responsible for the solvency of the debtor."); see also Restatement (Second) of Contracts § 333(2) ("An assignment does not of itself operate as a warranty that the obligor is solvent or that he will perform his obligation."). Under the district court's ruling, any contract provision that attempts to state the law is superfluous and therefore must be interpreted in a manner inconsistent with the law. We do not interpret New York's law regarding contract construction so broadly.

Finally, our conclusion as to the meaning of "without recourse" in the law of assignments is in accord with the meaning of that term for negotiable instruments. An indorser of a negotiable instrument assumes credit liability. See UCC § 3-415(a), Utah Code Ann. § 70A-3-415(a) (an indorser becomes liable to pay the instrument according to its terms if the primary obligor fails to pay the instrument). The indorser may disclaim credit liability by indorsing the instrument "without recourse." See UCC § 3-415(b). Disclaiming credit liability by indorsing "without recourse" does not, however, disclaim applicable transfer and presentment warranties. See UCC § 3-416 cmt. 3.

Because LifeWise Family's assignment of the policies to LifeWise Master was without recourse, we hold that BP's lien on the collateral was released upon the transfer of the loans from LifeWise Family to LifeWise Master. LifeWise therefore did not fail to satisfy a condition precedent to the funding agreement

with E*TRADE.

B.    The Damages Issue

Having concluded that LifeWise did not fail to satisfy a condition precedent does not end our review. The question we now turn to is whether the district court erred in rejecting the fourth damages model proffered by LifeWise and in declining to consider what LifeWise refers to as "reliance" damages. We conclude that the court correctly ruled that the future lost profits evidence was speculative and thus properly excluded, and that the jury verdict in favor of E*TRADE precludes reliance damages.

We review the district court's grant of summary judgment and its conclusions of law de novo, applying the same legal standard used by the district court under Rule 56. Essence, Inc. v. City of Federal Heights, 285 F.3d 1272, 1283 (10th Cir. 2002). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." N. Tex. Prod. Credit Ass'n v. McCurtain County Nat'l Bank, 222 F.3d 800, 806 (10th Cir. 2000) (internal quotation marks and citations omitted). We review a district court's decisions excluding evidence at the summary judgment stage only for an abuse of discretion. Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1016 (10th Cir. 2002). Under this standard, "we will not disturb the district court's decision unless we have a definite and firm conviction

that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (internal quotation marks and alteration omitted).

1.     Lost Profits Damages

LifeWise submitted a total of four damages models to the district court, all of which were excluded. LifeWise appeals only the district court's decision to exclude its fourth and final model.[10] In short, the first three damages models were excluded because they were found to be deficient under Rules 403 and 702, Daubert/Kumho, and New York's requirement that alleged losses be capable of being proved with reasonable certainty, see Schonfeld v. Hilliard, 62 F. Supp. 2d 1062, 1071-72 (S.D.N.Y. 1998).

---

[10]In its reply brief, LifeWise argues that it did appeal the district court's rulings concerning the three previous damages models in that (1) its Notice of Appeal included "all prior rulings . . . leading up to the final judgment;" (2) LifeWise's Statement of Issues in its opening brief appealed broadly the district court's rejection of all lost profits evidence; (3) the factual and procedural history for each model is provided in the background section of the opening brief; and (4) LifeWise provided record cites where it preserved for appeal each of the district court's adverse rulings. Aplt. Reply Br. at 16 n.7 (citations omitted). All of these points, however, only show that LifeWise could have appealed the district court's rulings on the other damages models. An examination of the argument section of LifeWise's brief, however, shows that it did not in fact appeal such rulings, as it set forth no substantive arguments against the district court's decisions. See Aplt. Br. at 50-72; Dubbs v. Head Start, Inc., 336 F.3d 1194, 1202 n.4 (10th Cir. 2003) ("even issues designated for review are lost if they are not actually argued in the party's brief"); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . .").

LifeWise's fourth damages model based a damages amount on an estimate of $167 million in projected loans from April 2001 through the end of 2005. X Aplt. App. at 4502-03, 4510, 4514. In a nutshell, LifeWise predicted that based on the $167 million figure, gross revenue was about $44 million, and total costs about $30 million. Id. at 4502-03. When costs are subtracted from the gross revenue, the resulting lost profits equal $14 million (this figure increases to $19 million if a longer average loan life is used). Id. at 4503 & n.6. Then, applying a discount rate of 13%, the resulting damages in present (April 1, 2001) dollars, depending on the average loan life and other variables, are from $6.7 million to $9.3 million. Id. at 4503-04.

The district court held that this fourth damages model (1) was unduly speculative because it was not sufficiently based on LifeWise's past, (2) failed to meet the requirements of Daubert and Rule 702 because Mr. Livingston was not qualified as an expert on the methodology employed in the statement, the methodology was not reliable, Livingston's testimony did not "fit" the case, and the statement was not helpful to a jury, and (3) was inadmissible under Rule 403 because any probative value was outweighed by the danger of being misleading and confusing to the jury and unnecessarily time-consuming.

a.     Mr. Livingston's Testimony

LifeWise argues that the district court erred in failing to admit Mr.

Livingston's damages testimony as an expert opinion under Rule 702, and as a lay witness opinion under Rule 701.

i.     Rule 702

Rule 702 allows expert testimony only where the "witness [is] qualified as an expert by knowledge, skill, experience, training, or education" to offer such opinions. To qualify as an expert, Mr. Livingston was required to possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." Graham v. Wyeth Labs., 906 F.2d 1399, 1408 (10th Cir. 1990) (quoting Bridger v. Union Ry. Co., 355 F.2d 382, 387 (6th Cir. 1966)). The heart of expert testimony is the foundation. Whether a witness can parrot the results of a model does not mean that he is qualified to explain how the model works or to opine on the statistical validity or interpretation of the results. See Wilkins v. Univ. of Houston, 662 F.2d 1156, 1157 (5th Cir. Dec. 1981) ("Since multiple regression analysis is subject to misuse, courts cannot be expected to accept at face value conclusions derived from such a model absent expert testimony concerning the validity of the model itself.") (emphasis added).

However, Mr. Livingston was not an expert in damages analysis or in any of the techniques used to create the September 13, 2002, damages model. He admitted that he had never used the methods used to create the September 13,

2002, damages model; he even confessed that "I am not a [damages] modeler." IX Aplt. App. at 3994; see also XI Aplt. App. at 4850 ("I'm not an accountant and I'm not an academic"); id. at 4851 ("I'm not an expert on regression analysis."); id. at 4852 ("I am not a statistician and I'm not an expert about regression analysis."). Indeed, Mr. Livingston took a single undergraduate class in economics. But he took no accounting or finance courses, had no training in damage analysis, had never testified as a damages expert or prepared an expert damages report, had never taught a course or lectured on damages, and has never been published in the field. Id. at 4855-56. As the district court noted, Mr. Livingston is "not a trained economist and cannot legitimately educate a jury on many of the complex economic aspects of [the damages model] such as 'S-curves.'" XIII Aplt. App. at 5634 n.10; see also TK-7 Corp. v. Barbouti, 993 F.2d 722, 728 (10th Cir. 1993) (affirming exclusion of witness who was not qualified as an expert); Broadcourt Capital Corp. v. Summa Med. Corp., 972 F.2d 1183, 1195 (10th Cir. 1992) (holding that witness with some general experience and education in the field lacked sufficient qualifications to qualify as expert in the area); Brown v. Am. Honda Motor Co., 939 F.2d 946, 952 (11th Cir. 1991) (concluding that statistics, "without an analytic foundation, are virtually meaningless."). Given Mr. Livingston's utter lack of any familiarity, knowledge, or experience with damages analysis, the district court did not abuse

its discretion in ruling that he could not testify as an expert regarding such a complex subject matter as LifeWise's fourth damages model.

Moreover, the district court also held that LifeWise's fourth damages model failed to meet the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), because (1) Mr. Livingston was not qualified as an expert in most of the methodology used in the statement, (2) the methodology is misleading, not reliable, and unsupported by use in any other comparable setting, (3) the methodology does not fit the present case because three month rolling averages are not appropriate for making profit predictions beyond one period, and S-curves are not appropriate for a young company such as LifeWise that claims to have a vast untapped market in need of its unique loan product, and (4) the model was not helpful to a jury but would tend to confuse, mislead, and waste time. XIII Aplt. App. at 5634-35.

Lifewise does not challenge any of the district court's bases for excluding the damages model itself under Daubert and Kumho Tire except by arguing that the district court improperly weighed evidence. Aplt. Br. at 55-56. However, the court found that LifeWise's use of three-month rolling averages, step-down methodologies, compounded monthly growth rates, S-Curves, and a 13% discount rate was "unique to this case and not based on any recognized

standard." XIII Aplt. App. at 5630. Moreover, the methodology was not in regular usage for predicting future profits, was not peer reviewed, has no uniform usage in any known industry, and is capable of manipulation to achieve virtually any desired result. Id. LifeWise does not challenge any of these points. The district court did not abuse its discretion.

    ii.     <u>Rule 701</u>

The district court did not analyze Mr. Livingston's testimony as lay opinion testimony under Rule 701. LifeWise, however, argues that Mr. Livingston's position as CEO of LifeWise gives him personal knowledge to testify as to its lost profits.

When the subject matter of proffered testimony constitutes "scientific, technical, or other specialized knowledge," the witness must be qualified as an expert under Rule 702. Rule 701 applies only "[i]f the witness is not testifying as an expert." Fed. R. Evid. 701. Indeed, the rule expressly prohibits the admission of testimony as lay witness opinion if it is based on "specialized knowledge." Id. In other words, "a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." <u>Doddy v. Oxy USA, Inc.</u>, 101 F.3d 448, 460 (5th Cir. 1996).

In this case, Mr. Livingston testified only regarding LifeWise's fourth

damages model. The model concerned moving averages, compounded growth rates, and S-curves. Mr. Livingston could not testify about these technical, specialized subjects under Rule 701.

The cases string-cited by LifeWise allowing a business owner to opine as to value do not support its position. In one group of cases, the courts found business owners' testimony admissible under Rule 701 because the owners had sufficient personal knowledge of their respective businesses <u>and</u> of the factors on which they relied to estimate lost profits. <u>See</u> <u>Malloy v. Monahan</u>, 73 F.3d 1012, 1015-16 (10th Cir. 1996); <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1174-75 (3d Cir. 1993); <u>In re Merritt Logan, Inc.</u>, 901 F.2d 349, 360 (3d Cir. 1990); <u>MCI Telecomms. Corp. v. Wanzer</u>, 897 F.2d 703, 706 (4th Cir. 1990). In other cases, the owners offered valuations based on straightforward, common sense calculations. <u>See</u> <u>Securitron Magnalock Corp. v. Schnabolk</u>, 65 F.3d 256, 265 (2d Cir. 1995) (business owner calculated past lost profit damages for defamation based on actual decrease in sales); <u>State Office Sys, Inc. v. Olivetti Corp. of Am.</u>, 762 F.2d 843, 847 (10th Cir. 1985) (business owner calculated that its lost profits equaled its lost profit per computer times 29 lost sales); <u>Teen-Ed, Inc. v. Kimball Int'l, Inc.</u>, 620 F.2d 399, 402-03 (3d Cir. 1980) (plaintiff, an authorized dealer of defendant's product for five years, used historical gross profit margin and historical gross sales to determine lost profits). Mr.

Livingston's proposed expert testimony does not fit either circumstance.

In the present case, although Mr. Livingston was the president of the company, he does not have personal knowledge of the factors used by LifeWise's fourth damages model to estimate its lost profits. On the other hand, the district court acknowledged that Mr. Livingston could have testified solely as a businessperson based on his personal knowledge and his experience as president of the company. He could have given a straightforward opinion as to lost profits using conventional methods based on LifeWise's actual operating history. Indeed, the court essentially invited LifeWise to have him so testify. See XIII Aplt. App. at 5639.

Instead of limiting Mr. Livingston's testimony to his experience as a businessperson and president of the company, however, LifeWise had him "enter[] into the realm of rolling averages, S-curves, and compound growth rates that appear to be an amalgam of logic, hope, and economic jargon." Id. at 5636-37. But Mr. Livingston himself admitted that he "can't recall any prior instances" where he used such methods at LifeWise. XI Aplt. App. at 4961. Such subject matters fail to be rationally based on Mr. Livingston's perception, and therefore cannot be admissible as lay opinion testimony.

b.     New York Law

Even were we to find that Mr. Livingston was qualified to testify about the

- 27 -

intricacies of LifeWise's September 13 damages model, we nevertheless agree with the district court that the model itself fails to satisfy New York's prohibition of speculative damages. Loss of future profits as damages for breach of contract are allowed under New York law only if (1) it is demonstrated with certainty that such damages have been caused by the breach, (2) the alleged loss is capable of proof with reasonable certainty, and (3) the particular damages were fairly within the contemplation of the parties to the contract at the time it was made. Kenford Co. v. County of Erie, 493 N.E.2d 234, 235 (N.Y. 1986). Under the second prong, damages may not be "merely speculative, possible or imaginary." Id.

The district court found that LifeWise's damages model was too speculative. LifeWise claims that its damages were reasonably certain and not speculative because (1) it had an established business, (2) it was profitable, (3) its damages statements were based on an analysis of historical operations, (4) it was not based on a deficient scientific formula, and (5) determination of the appropriate discount rate is for the jury.

Under New York law, evidence of lost profits by new businesses must be received with greater scrutiny. Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000); see also Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 332 (2d Cir. 1993); Kenford, 493 N.E.2d at 234-35. This is because they do

not have a "reasonable basis of experience–i.e. historic profits–upon which to estimate lost profits with the requisite degree of reasonable certainty." Schonfeld v. Hilliard, 62 F. Supp. 2d 1062, 1071-72 (S.D.N.Y. 1999).

LifeWise argues it was not a new business because the concept was devised, assets were acquired, and loans were being issued three years before the Facility was signed. Aplt. Br. at 61. In addition, since the inception of its loan program, LifeWise made credit available to borrowers totaling more than $33 million. IV Aplt. App. at 1698. Finally, the Facility was in effect for well over a year before E*TRADE first denied funding in April 2000. XV Aplt. App. at 6667-68.

While its history of operations clearly does not make LifeWise as firmly established as some other businesses, we think it probably places LifeWise outside of the scope of "new businesses" contemplated by Schonfeld and Kenford. Generally, cases applying a higher evidentiary standard for new businesses involve businesses that had not yet begun to operate, or have been running for just a few months. See, e.g., Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc., No. 95 Civ. 8450, 1998 WL 422482, at *1-2 (S.D.N.Y. July 22, 1998) (plaintiff dressmaker had only completed one single order for dresses); Kenford, 493 N.E.2d at 235 (stadium, which would provide revenue, was never constructed); Zink v. Mark Goodson Prods., Inc., 689 N.Y.S.2d 87, 88 (N.Y.

App. Div. 1999) (proposed television game show was to feature a host not well known to American audiences who had never previously hosted a game show); Lee Kin Chiu v. City of N.Y., 666 N.Y.S.2d 872, 874 (N.Y. App. Div. 1997) (plaintiffs were involved in new business for less than two months).

However, although the evidentiary standard may be heightened for new businesses, "[w]hether the claim involves an established business or a new business, . . . the test remains the same, i.e., whether future profits can be calculated with reasonable certainty." Ashland Mgmt. Inc. v. Janien, 604 N.Y.S.2d 912, 916 (N.Y. 1993); see also Coastal Aviation, Inc. v. Commander Aircraft Co., 937 F. Supp. 1051, 1066 (S.D.N.Y. 1996) ("The New York Court of Appeals has instructed that the key issue is whether damages can be proven to 'reasonable certainty.'") (quoting Kenford, 493 N.E.2d at 235). Thus, rather than focus on whether LifeWise should be labeled a "new business" or an established one, we address the issue of whether LifeWise can establish lost future profits with reasonable certainty.

LifeWise argues that despite the district court's findings, its business was profitable. Specifically, LifeWise claims that the second half of 2001 would have been a profitable period if its litigation expenses against E*TRADE were excluded. Aplt. Br. at 62. However, LifeWise shut down its operations in April 2001 and thus severely cut its advertising, payroll, and other costs, yet continued

- 30 -

to generate revenue as borrowers died.  X Aplt. App. at 4511, 4522.  Other than the second half of 2001, LifeWise concedes that it incurred five years of straight losses.  Aplt. Br. at 62.

LifeWise argues, however, that a history of losses does not necessarily preclude an award of future profits.  In support of this argument, LifeWise cites two cases, Yusef Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 23-24 (2d Cir. 1997), and Lamborn v. Dittmer, 873 F.2d 522, 533 (2d Cir. 1989).  Contrary to LifeWise's assertion, Yusef Ahmed did not "apply[] New York Law to uphold lost profits of $46 million even though plaintiff had substantial losses."  Aplt. Br. at 62.  Instead, the court held that an arbitrator's decision to award that amount did not meet the high standard for overruling a decision under the Federal Arbitration Act–"manifest disregard of the law."  126 F.3d at 23-24.  That case is therefore not applicable.  Similarly, Lamborn did not involve lost profits damages, but rather concerned the proper methodology in estimating the value of an entire business.  873 F.2d at 533-34.  It is thus distinguishable from the present case.

Even assuming that LifeWise could show lost profits damages despite never having been profitable, it has not done so here in a manner that satisfies New York's prohibition of speculative damages.  In its damages report, LifeWise has failed to connect its past losses with its proposed future earnings.  It remains

a fact that LifeWise sustained losses in every year of its over five years of existence, and frequently experienced capitalization problems, yet the damages model predicted only uninterrupted future growth.

For instance, according to its audited financial statements, LifeWise lost at least $12 million from February 1996 to April 2001, for an average yearly loss of over $2.2 million. XI Aplt. App. at 4934. However, the damages model turns LifeWise into a successful company with over $14 million in net profits from April 2001 to December 2005, for an average yearly net profit of approximately $3 million. Similarly, during LifeWise's history, the number of loan originations fluctuated each month: 28 months show a decline in originations while 33 months show an increase. X Aplt. App. at 4647, XII Aplt. App. at 5244. However, under the LifeWise's damages model, Mr. Livingston anticipated not a single future setback. In LifeWise's actual history, its average monthly change in loan originations was an increase of $18,288. XI Aplt. App. at 4906-07, 4945. However, under its fourth damages model, LifeWise's average monthly increase is $44,992–nearly two and a half times more. Id. at 4922. Finally, over its five-year history, LifeWise originated approximately $24 million in loans. X Aplt. App. at 4647. Now, it claims that in a shorter period, it will originate over $167 million–over seven times more. LifeWise has simply failed to show any sort of link between its past history and its future predictions.

The two cases LifeWise cites in support of its position are distinguishable. In <u>Merlite Industries, Inc. v. Valassis Inserts, Inc.</u>, 12 F.3d 373, 374 (2d Cir. 1993), the plaintiff had been operating for over forty years, and was an established, profitable company. LifeWise, on the other hand, has never been profitable, and its attempt to use a small slice of its short operating history to show that enormous profits were expected from an unsubstantiated turnaround in business is unacceptable. Similarly, in <u>Travellers International, A.G. v. Trans World Airlines, Inc.</u>, 41 F.3d 1570, 1579 (2d Cir. 1994), the parties had a 20-year joint venture agreement. The court found that the long-term course of dealings between the parties, coupled with demonstrable profit margins and a verifiable pricing structure permitted lost profits to be calculated with reasonable certainty. This is a far cry from LifeWise's comparatively disappointing history of operations. The district court properly excluded LifeWise's fourth damages model as overly speculative under New York law.[11]

---

[11]The district court also found that LifeWise's fourth damages report was more likely to confuse and mislead a jury than to help it, and thus excluded the report under Federal Rule of Evidence 403. XIII Aplt. App. at 5635. LifeWise has failed to adequately respond to this alternative basis for excluding its fourth damages report, <u>see</u> Aplt. Br. at 69 n.39, and the issue is therefore waived, <u>Eateries, Inc. v. J.R. Simplot Co.</u>, 346 F.3d 1225, 1232 (10th Cir. 2003). Even were the argument not waived, we have reviewed LifeWise's fourth damages report, which consists of nearly 500 pages including exhibits, X Aplt. App. at 4501-647; III Aplt. App. at 1026-106; VII Aplt. App. at 3055-149, 3151-56, 3173-74; VIII Aplt. App. at 3758-88, 3792, 3848-64; XIII Aplt. App. at 5796-899, and we believe the district court did not abuse its discretion in determining that

2.      Reliance Damages

In light of its disposition of the case on the liens issue and lost profits damages, the district court did not reach LifeWise's claim for reliance damages. XIII Aplt. App. at 5666. LifeWise now argues that even if this court affirms the district court on the issue of lost profit damages, we should still remand the case to the district court to determine what, if any, reliance damages it may recover. Based on the jury's finding that E*TRADE's discontinuation of funding was not in breach of the Funding Agreement, see id. at 5593, we disagree.

In order to recover reliance damages for breach of contract, the plaintiff must demonstrate with certainty that there was a breach and that such damages have been caused by the breach. See Kenford Co. v. County of Erie, 493 N.E.2d 234, 235 (N.Y. 1986). In other words, there must be a "definite and logical connection between what is proved and the damages a jury is asked to find." Berley Indus., Inc. v. City of New York, 385 N.E.2d 281, 283 (N.Y. 1978).

As noted above, the jury found that (1) E*TRADE had a good faith basis for denying funding because it was not satisfied with the general business operations of LifeWise, but (2) E*TRADE did not adequately disclose in writing the reasons for its dissatisfaction with LifeWise's business operations. XIII

the danger from confusion of the issues, misleading the jury, and waste of time presented by the model substantially outweighed its probative value. Macsenti v. Becker, 237 F.3d 1223, 1240 (10th Cir. 2001).

Aplt. App. at 5592-93. However, upon the district court's issuance of its Memorandum Opinion and Order granting E*TRADE's Motion for Summary Judgment Regarding Lost Profits Damages and E*TRADE's Motion for Judgment as a Matter of Law on the Basis of LifeWise's Failure to Satisfy Conditions Precedent Relating to Liens, the district court entered judgment in favor of E*TRADE and vacated the jury verdict. Id. at 5667.

LifeWise argues that because the jury's verdict was vacated, its finding that E*TRADE did not deny the funding in bad faith cannot be used to argue that no causal link connects E*TRADE to LifeWise's damages. We disagree. A judge "continue[s] to be bound by a jury's findings even if its verdict is vacated, so long as the underlying factfinding is not impugned." Artis v. Hitachi Zosen Clearing, Inc., 967 F.2d 1132, 1138 (7th Cir. 1992); cf. Lytle v. Household Mfg., Inc., 494 U.S. 545, 550 (1990). Here, the jury verdict was vacated not because it was thought to be unreliable, but rather because the district court's decision as to a matter of law made the verdict moot. Compare Dranchak v. Akzo Nobel, Inc., 88 F.3d 457, 459 (7th Cir. 1996) (when events during trial and improper omission from jury instructions contributed to reasons for setting aside verdict, the verdict's factual accuracy is impugned, and verdict has no implications in court's analysis of non-jury issues). Thus, as the jury's finding that E*TRADE denied funding in good faith was not appealed, it must stand. Such a finding

- 35 -

removed any causal connection between E*TRADE's denial of funding and LifeWise's reliance damages.

Alternatively, LifeWise argues that E*TRADE, by refusing to provide adequate grounds for its dissatisfaction, "deprived LifeWise of the ability to cure and resulted in the loss of the Facility and destruction of LifeWise's business." Aplt. Reply Br. at 26. This argument presupposes a right to cure, a right that we do not see in the agreement documents, and which was not pinpointed in LifeWise's briefs. When pressed in oral argument about where such a right originated, counsel for LifeWise first pointed to § 4.10 of the Funding Agreement, I Aplt. App. at 259. In his rebuttal argument, counsel corrected himself, stating that the right to cure was not in the Funding Agreement, but in sections 6.1(c) and 11.3 of the Trust Indenture. XV Aplt. App. at 6583, 6609. Finally, in a letter to the court after oral argument, counsel stated that he "misread" the proper references. According to counsel, (1) § 11.1 of the Funding Agreement, I Aplt. App. at 270, refers to the Trust Indenture for events of default; (2) § 6.1(c) and (d) of the Trust Indenture, XV Aplt. App. at 6583, defines "Events of Default" for breach of covenant and breach of warranty; and (3) § 11.3 of the Trust Indenture, XV Aplt. App. at 6609, further refers to breaches of warranty.

We do not read either the Funding Agreement or the Trust Indenture to

provide an opportunity for LifeWise to cure its breach of § 4.10 of the Funding Agreement. Sections 6.1(c)-(d) and 11.3 allow 30 days to cure a breach of certain representations or warranties. XV Aplt. App. at 6583, 6609. Section 4.10 is a condition precedent to each funding, not a representation or warranty. I Aplt. App. at 257-59. Accordingly, the provisions in the Trust Indenture cited by LifeWise do not give a contractual right to cure a breach of section 4.10.

As a last resort, LifeWise essentially claims that a cure provision is implied in § 4.10 because (1) such notice would be useful only if LifeWise can address the alleged concerns, and (2) E*TRADE in fact requested LifeWise to cure its dissatisfaction before it declined to fund. We disagree.

First, LifeWise does not oppose the district court's statement of undisputed facts, which indicates that the notice provision grew out of E*TRADE's desire to have the ability to be released from the contract in its sole discretion. See XIII Aplt. App. at 5598. The provision ensures that a decision by E*TRADE to terminate funding is objectively reasonable and in good faith. It does not, explicitly or implicitly, confer any right whatsoever to LifeWise to cure any defect identified by E*TRADE. Second, the fact that E*TRADE requested that LifeWise address E*TRADE's dissatisfaction before E*TRADE declined to fund does not create a contractual right to cure after E*TRADE declined to fund. Finally, even if a cure provision existed, it could not be a basis for causation.

LifeWise has offered no evidence that within 30 days, it could have improved its business operations to meet E*TRADE's good faith satisfaction.

LifeWise therefore cannot claim reliance damages resulting from E*TRADE's failure to fund or failure to provide adequate reasons for its refusal to fund.

AFFIRMED.